Jennifer L. KELLMANN, Appellant,

v.

**WORKSTATION INTEGRATIONS, INC., Appellee.**

No. 14–09–00889–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 30, 2010.

Jimmie D. Aycock Jr., Lauren Beck Harris, Houston, for appellant.

Bill R. Bludworth, Pam Rea, Houston, for appellee.

Panel consists of Justices ANDERSON, FROST, and BROWN.

## OPINION

KEM THOMPSON FROST, Justice.

This appeal arises out of litigation between a company and its former employee who resigned and opened a competing business. We must determine whether the evidence is legally and factually sufficient to support the trial court's judgment on jury findings that the former employee committed a theft of trade secrets and breached a fiduciary duty during her employment and that, as a result, the former employer is entitled to damages in the form of lost profits and attorney's fees. Finding no evidence to support the award of lost profits and no "prevailing party" status for the recovery of attorney's fees, we reverse the judgment in part and render judgment that the former employer take nothing. We affirm the remainder of the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant Jennifer Kellmann worked as a senior consultant for appellee Workstation Integrations, Inc. for approximately six years. During this time, Workstation Integrations provided computer support to small and mid-size oil and gas companies that did not maintain full-time computer-support staff. Primarily, Workstation Integrations used specialized software to interpret seismic data the customer provided. Founded in 1993 by Lee and Laura Kay Ethetton, the company hired its first employee, Marc Roulston, in 1997. The following year, Workstation Integrations

hired Kellmann, who was experienced in computer technology and had a background as a geophysicist. Workstation Integrations did not ask Kellmann to sign a confidentiality or non-compete agreement.

During her first five years with the company, Kellmann enjoyed her job and felt part of a team. In 2003, however, Lee left the company for a sabbatical for about five months, and the Ethettons divorced. During this time, Laura Kay, Roulston, and Kellmann were very busy at Workstation Integrations. When Lee returned in October 2003, Workstation Integrations decided to make changes in the delegation of client responsibilities. Under the new policy, each client was to have both a primary contact and a secondary contact who were to be equally familiar with the client's needs. Kellmann was to serve as the primary contact for five clients, and Lee was to be the primary contact for fifteen clients. Laura Kay and Roulston also had primary responsibility for several clients.

Kellmann felt the assignments were a "double edged sword." She wanted Lee back at work because her workload had been overwhelming in his absence, but the new policy also meant a loss of income for her, as she was compensated on a salary-plus-commission basis. Additionally, according to Kellmann, many clients had developed relationships with specific people at Workstation Integrations, and they wanted to contact the individual of their choice regardless of the company's primary and secondary designations.

In early 2004, Workstation Integrations was losing clients as a result of a downturn in the oil industry. At that time, Lee and Laura Kay called a team meeting to discuss how the company could stay in business and be profitable during the economic downturn. At the same time, Workstation Integrations decided to implement written policies. Under the written policies, Workstation Integrations's employees were not permitted to discuss with clients "the personal situation between Lee and Laura" or internal disagreements. Complaints about Workstation Integrations's personnel were to be immediately reported to Laura Kay.

During this same time frame, Workstation Integrations issued an employee handbook Laura Kay had authored. The handbook provided that "[Workstation Integrations does] not allow personal use of Company property unless specifically authorized in this Handbook." The handbook also provided that "[a]ll emails sent to or received from a client are considered company business," and included a provision regarding the improper disclosure of "sensitive information, confidential information, proprietary information or trade secret information."

Kellmann became increasingly frustrated with Workstation Integrations. She believed that her work was not appreciated and she occasionally lashed out at the Ethettons. Disagreements erupted between Kellmann and Lee regarding Kellmann's noncompliance with Workstation Integrations's new policies. Kellmann also sometimes failed to provide Workstation Integrations with her monthly time sheets by the first of the month. In February 2004, Lee sent Kellmann an email outlining several criticisms of her work. Kellmann believed the email signaled that Workstation Integrations wanted to terminate her employment. She forwarded the email to Tracy Grace, who worked for Woodside, a Workstation Integrations client. Kellmann expressed her concern to Grace, as well as her desire to seek a position with Woodside.

In March 2004, Kellmann was advised that a client she had been servicing, Mariner, would be assigned to Lee as the primary contact and Kellmann as the second-

ary contact. Though unhappy with the decision, Kellmann accepted it and ultimately complied with it. But problems continued and Kellmann again complained to Grace at Woodside. In an email, Kellmann stated that "the straw that broke the camel's back happened yesterday" and surmised that she would "probably go solo for awhile." In another email, Kellmann explained to Grace that she was very angry and indicated that she was still interested in the potential job opportunity with Woodside. Kellmann also wrote, "I'm going to need to know whether or not to take some of my other clients with me when I go. I'd like to just out of spite, but wouldn't be able to if the Woodside gig is a full-time contract."

In late June 2004, Kellmann received a call from a representative of a client, Fairfield, who was upset that he had not received a quote for a piece of equipment. Lee was the primary contact for Fairfield. Kellmann called Laura Kay and asked if she could provide the quote; Laura Kay told Kellmann that she would contact Lee about it. Kellmann claimed that she did not call Lee because Lee did not return her calls. Later, Lee sent Kellmann a highly critical email chastising her for not contacting him and directing her to meet with him to discuss the incident. Kellmann was taken aback by the email because she did not believe she had done anything wrong; she believed that Workstation Integrations wanted to get rid of her. Kellmann decided to resign.

Kellmann met with Lee on July 2 as he had requested. Lee gave her a paycheck, and, in return, Kellmann gave him her resignation letter. In the letter, Kellmann stated that her last day would be July 16, 2004, "unless deemed otherwise." Kellmann and Lee agreed that she would continue to work for Workstation Integrations and service clients for the next two weeks.

Shortly after that, Kellmann emailed Susan Poorman–Blackie, a woman employed with another Workstation Integrations client, Bois d'Arc:

> I just wanted to let you know that I quit Workstation Integrations on Friday. Lee had some more unprofessional and insulting email for me on Thursday along with a voice mail. I decided that I'd rather quit than be treated like that. I emotionally and physically couldn't handle the stress any more.

> More than likely, I'll start my own consulting firm once I've completed my two weeks (or less) at WI. No worries. You guys will be taken care of. The best way to get ahold [sic] of me is going to be back on my old cell phone.

Poorman–Blackie responded: "Good to hear from you. You did the right thing, no doubt. Life is too long for mistreatment. I like Kellmann Consulting. I'll call you today, but I'm hoping we will be on your customer list?"

A few days before Kellmann's scheduled departure, Laura Kay conducted a final "exit lunch" with Kellmann. At the meeting, Kellmann returned items Laura Kay had requested, including the employee manual, a tool kit, and computer hardware. Kellmann still had one, older-model personal computer belonging to Workstation Integrations, but Laura Kay told her she could keep it. Kellmann left her employment with Workstation Integrations on July 16, 2004, as scheduled.

Less than a week after leaving Workstation Integrations, Kellmann incorporated Kellmann Consulting, Inc. Because of her personal relationship with many of Workstation Integrations's clients, those clients opted to send their business to Kellmann and her new company. As a result, Workstation Integrations lost most of its business.

In December 2004, Workstation Integrations, through its lawyer, requested Kellmann to return its old computer. After retrieving the computer, Workstation Integrations sent it for a forensic analysis. The analysts were able to recover some deleted files, and to determine that the computer had been accessed several times by an "external device" indicating that data was transferred on or off the system. Workstation Integrations's analysts also found that the day Kellmann resigned, there appeared to be deletions of files and some copying of files, including emails and email attachments relating to former Workstation Integrations clients.

Workstation Integrations filed suit against Kellmann and Kellmann Consulting alleging claims for tortious interference with contract and business relationships, defamation, slander, violations of the Texas Penal Code, unfair competition, conversion, breach of fiduciary duty, misappropriation of confidential information and trade secrets, and claims under the Computer and Fraud Abuse Act. Kellmann and Kellmann Consulting answered the suit and Kellmann asserted a counterclaim for breach of contract and intentional infliction of emotional distress.

The case was tried to a jury. Workstation Integrations withdrew its claims under the Computer and Fraud Abuse Act as well as its claims for defamation, business disparagement, and unfair competition, and the trial court directed a verdict against Workstation Integrations on its tortuous-interference claim. Workstation Integrations requested and received a trial amendment to plead a claim under the Theft Liability Act. The trial court denied Kellmann's motion for directed verdict on Workstation Integrations's claims for misappropriation of trade secrets, breach of fiduciary duty, and conversion. The trial court granted a directed verdict against Kellmann on her claims for intentional infliction of emotional distress and attorney's fees.

The jury found Kellmann committed a theft of trade secrets, misappropriated trade secrets, and breached her fiduciary duty. Workstation Integrations elected the jury's award of $135,986 for theft of trade secrets and the jury's $12,500 award for breach of fiduciary duty for a total damage award of $148,486. The trial court awarded Workstation Integrations $148,486 in actual damages, $25,832.50 in prejudgment interest, and $35,000 in reasonable and necessary attorney's fees against Kellmann individually. The trial court did not award any recovery against Kellmann Consulting. The trial court also rendered a take-nothing judgment in favor of Workstation Integrations against Kellmann and Kellmann Consulting. The trial court denied Kellmann's motion for judgment notwithstanding the verdict and motion for new trial.

On appeal, Kellmann challenges, among other things, the legal and factual sufficiency of the evidence of lost profits.[1]

1. Kellmann also challenges the legal and factual sufficiency of the evidence of causation of damages, existence of trade secrets, theft of trade secrets, misappropriation of trade secrets, existence of a confidential relationship, breach of fiduciary duty, and attorney's fees. She also contends the awards of damages under the Theft Liability Act and breach-of-fiduciary-duty claims are based on the same injury and damages in violation of the "one satisfaction" rule. Concerning her own claims, Kellmann contends that the trial court abused its discretion in excluding evidence of disparaging emails from her employer, the trial court erred in directing a verdict on her intentional infliction-of-emotional-distress claim, the jury's failure to find that Workstation Integrations breached the agreement to pay her commission was against the great weight and preponderance of the evidence or the claim was established as a matter of law, and the trial court erred in directing a verdict

## II. LEGAL INSUFFICIENCY

When both the legal and factual sufficiency of the evidence are challenged, we first review the legal sufficiency of the evidence to determine whether the record contains any evidence of probative value to support the factfinder's decision. *See Manon v. Tejas Toyota, Inc.*, 162 S.W.3d 743, 752 (Tex.App.-Houston [14th Dist.] 2005, no pet.). In a legal-sufficiency or no-evidence review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex.2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.*

 Evidence is legally insufficient "[w]hen (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). Evidence that is " 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists" is less than a scintilla. *Kroger Tex., Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex.2006) (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

 Lost profit estimates or opinions must be based on objective facts, figures, or data from which the lost profits amount may be ascertained. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex.2010); *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994); *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84–85 (Tex.1992). When a review of the surrounding circumstances establishes that the profits are not reasonably certain, there is no evidence to support the lost profits award. *Formosa Plastics Corp. v. Presidio Eng'rs and Contractors*, 960 S.W.2d 41, 50 n. 3 (Tex. 1998); *Capital Metro. Transp. Auth. v. Central of Tenn. Ry. & Navigation Co.*, 114 S.W.3d 573, 579–82 (Tex. App.-Austin 2003, pet. denied). In our legal-sufficiency analysis, we thus review whether competent evidence establishes the amount of lost profits awarded with reasonable certainty. *See Swinnea*, 318 S.W.3d at 876.

██ Lost profits are damages for the loss of net income to a business and, broadly speaking, reflect income from lost-business activity, less expenses that would have been attributable to that activity. *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002). A claimant must demonstrate one complete calculation of lost profits. *Heine*, 835 S.W.2d at 84. The calculation of lost-profits damages must be based on net profits, not gross revenue or gross profits. *Heine*, 835 S.W.2d at 83 n. 1; *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex. App.-Dallas 1988), *writ denied per curiam*, 778 S.W.2d 865 (Tex.1989).

█ The only witness who testified at trial as to Workstation Integrations's claims of lost profits was Laura Kay, who holds a finance degree. She testified that she analyzed Kellmann's revenue from 2004–2007 invoices, and tax returns for

on Kellmann's claim for attorney's fees because she satisfied the "presentment" requirement of Texas Civil Practice and Remedies Code section 38.002. As explained in the text that follows, we do not reach these issues.

Kellmann and Kellmann Consulting.[2] She determined that Kellmann invoiced clients in the amount of $94,204.88 in 2004, $346,698.80 in 2005, $175,982.77 in 2006, and $146,391.35 in 2007, for a total of $763,277.80 over that time period. Laura Kay did not provide the jury with any other figures. Kellmann's counsel objected that there was insufficient evidence of lost profits.

The figures Laura Kay provided to the jury were purely gross numbers that did not account for any expenses, such as software licenses, medical insurance, rent, phone bills, taxes, employee salaries or any equipment costs. Laura Kay admitted that the numbers she provided to the jury were purely gross numbers:

> Q: [By Workstation Integrations's counsel] Now, adding those annual totals together from 2005 to 2005, 2006, and 2007, what's the total amount for those four years that Ms. Kellmann billed your clients?
>
> A: [By Laura Kay] The total is $763,277.80.
>
> Q: You're not contending that she didn't have some expenses, are you, out of this?
>
> A: No. This indicates revenue only. This is invoice totals.
>
> Q: Do you know the details of her expenses?
>
> A: No, I did not.

Laura Kay conceded that she could not determine Kellmann's expenses from the tax returns. And the summary Laura Kay prepared specifically states that it "doesn't reflect a deduction for expenses." Workstation Integrations presented no other evidence on this issue.

Workstation Integrations's evidence of gross figures, rather than net revenue, does not establish lost profits. *See, e.g., South Plains Switching, Ltd. v. BNSF Ry. Co.*, 255 S.W.3d 690, 696 (Tex.App.-Amarillo 2008, pet. denied) (testimony insufficient to establish lost profits when testimony related only to revenues, and there was no testimony offered concerning expenses); *Texaco, Inc. v. Phan*, 137 S.W.3d 763, 772 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (plaintiffs failed to meet their burden of proving net profits); *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 209 (Tex.App.-Fort Worth 2004, pet. denied) (finding no evidence of lost profits where evidence was offered only as to gross profits).

Workstation Integrations's lawyer attempted to cure the lack of evidence on lost profits during her closing argument by providing new numbers to the jury that she claimed took into account the deduction of Kellmann's expenses for equipment sales, taxes and licenses, and business expenses. But Workstation Integrations's lawyer's gross revenue numbers did not compare to, or even remotely match, the numbers Laura Kay had provided from the witness stand. Nor did Workstation Integrations's lawyer identify or explain the origin of the expense figures she was providing that Laura Kay had been unable to provide. Workstation Integrations's lawyer's statements during closing argument do not constitute evidence. *See McCain v. NME Hosps., Inc.*, 856 S.W.2d 751, 757 (Tex.App.-Dallas 1993, no writ) ("Motions and arguments of counsel are not evidence."). At least one Texas court has held that a monetary figure provided by counsel during cross-examination of a witness and that apparently was derived

---

**2.** In her testimony, Laura Kay acknowledged that, in her industry, tax returns are not customarily relied upon for this purpose.

from invoices was "no evidence to support the jury's lost profit award." *See Mood v. Kronos Products, Inc.*, 245 S.W.3d 8, 11 (Tex.App.-Dallas 2007, pet. denied). We do not consider these statements in our evaluation.

Workstation Integrations argues that Kellmann testified that her after-tax income in 2004 was $61,862; in 2005, $82,749; in 2006, $88,130; and in 2007, $84,359.[3] But Texas courts have rejected the argument that gross sales reflected in tax returns can support an award of lost profits. *See Rusty's Weigh Scales and Serv., Inc. v. N. Tex. Scales, Inc.*, 314 S.W.3d 105, 111 (Tex.App.-El Paso 2010, no pet.). Additionally, this court recently has rejected a similar attempt to show lost profits through lost gross revenues. *See Wiese v. Pro Am Servs., Inc.*, 317 S.W.3d 857, 863–64 (Tex.App.-Houston [14th Dist.] 2010, no pet.). Moreover, Kellmann testified that her after-tax income figures for 2004 also included salary and commissions for her work with Workstation Integrations though June 2004. Kellmann also testified that "quite a big number" of the gross revenues were for equipment sales, which makes the invoice total deceptive. Workstation Integrations acknowledges that Kellmann did not provide an estimate or other figures representing equipment sales.

During rebuttal, Laura Kay testified that Workstation Integrations's standard markup on equipment sales, "[f]or a large piece of equipment, [was] normally around 20 percent." She agreed that equipment sales continued to be a major source of revenue "for someone in her industry"

from 2004 through the present. But Laura Kay's testimony regarding Workstation Integrations's average markup on equipment did not provide evidence from which lost profits may be calculated with reasonable certainty. Laura Kay testified only to Workstation Integrations's general average markup for "large" equipment; her testimony did not account for other equipment or expenses, and Kellmann testified that the gross figures include equipment, software, and license costs. Further, testimony about Workstation Integrations's typical mark-ups does not constitute evidence as to actual costs to Kellmann. Without Kellmann's costs deducted from the relevant invoices, it is impossible to discern Kellmann's net profits. Workstation Integrations's attempt to apply its own costs to Kellmann's gross profits did not provide the jury with the required "one complete calculation" of lost profits. *See Swinnea*, 318 S.W.3d at 876; *Holt Atherton Indus., Inc.*, 835 S.W.2d at 84–85.

The requirement that Workstation Integrations suffered damages is an element of each of its liability theories. Lost profits was the sole measure of damages considered by the jury and awarded to Workstation Integrations in the judgment under each of Workstation Integrations's theories of recovery.

We have determined that the evidence is legally insufficient to demonstrate lost profits with reasonable certainty. Our holding that Workstation Integrations presented legally insufficient evidence of damages also precludes the award of attorney's fees under the Theft Liability Act because

---

3. Workstation Integrations also points to Laura Kay's testimony that the company would incur no substantial additional overhead to service the lost clients, had those clients continued to use Workstation Integrations's services, because the remaining employees could have handled the work and the overhead would have been substantially the same for three as for four employees. Laura Kay acknowledged, however, that when Workstation Integrations hired Wendy Crawford in October 2006, it would have had increased personnel costs.

Workstation Integrations is not a prevailing party. *See* Tex. Civ. Prac. & Rem. Code Ann. § 134.005(b) (West 2005); *Glattly v. Air Starter Components, Inc.,* 332 S.W.3d 620, 631–33 (Tex.App.-Houston [1st Dist.] 2010, no pet. h.). Because the evidence of lost profits is legally insufficient,[4] we reverse and render judgment that Workstation Integrations take nothing from Kellmann.[5]

### III. CONCLUSION

We sustain Kellmann's first issue, and reverse and render judgment that Workstation Integrations take nothing on its claims against Kellmann. The remainder of the judgment is affirmed.

---

4. All of the actual damages the jury awarded were for lost profits. Because the legal sufficiency of the evidence of lost profits damages is dispositive, we do not reach Kellmann's remaining issues concerning Workstation Integrations's claims against her.

5. At oral argument, counsel for Kellmann informed this court that Kellmann would waive her issues concerning her counterclaims if this court were to reverse and render judgment that Workstation Integrations take nothing on its claims. Based on Kellmann's waiver of these issues, we affirm that portion of the trial court's judgment rendering a take-nothing judgment in favor of Workstation Integrations on Kellmann's and Kellmann Consulting's counterclaims.