

# NUMBER 13-13-00087-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

LEGACY HOME HEALTH
AGENCY, INC.                                           **Appellant,**

**v.**

APEX PRIMARY CARE, INC.
                                          **Appellee.**

## On appeal from the 139th District Court
## of Hidalgo County, Texas

# MEMORANDUM OPINION

### Before Justices Rodriguez, Benavides, and Wittig[1]
### Memorandum Opinion by Justice Wittig

Appellant, Legacy Home Health Agency Inc., challenges the temporary injunction

---

[1] Retired Fourteenth Court of Appeals Justice Don Wittig assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to the government code. *See* TEX. GOV'T CODE ANN. § 74.003 (West 2005.)

order[2] issued by the trial court in favor of Apex Primary Care Inc. In four issues, Legacy argues abuse of discretion in signing the challenged order, the lack of sufficient evidence to show imminent and irreparable injury, the broadness of the order, and the failure to meet the requirements of Texas Rules of Civil Procedure 683. Although Adriana N. Guzman was also a named defendant, she did not appeal. We reverse and remand.

## I. BACKGROUND

Apex sued Legacy and its employee Guzman for multiple causes of action alleging unfair competition in the home health care business. Apex filed suit July 17, 2012, seeking both damages and injunctive relief. The trial court issued a temporary restraining order and set a hearing for August 2, 2012, at which time only Guzman testified. Guzman worked for Apex for several years ending in September 2009. She signed a non-compete agreement and covenant of nondisclosure two years into her employment with Apex in October 2008. Upon leaving Apex in September 2009, Guzman worked for a doctor. She did not begin to work for Legacy until August, 2010, almost a year later. Guzman denied Apex's allegations that she appropriated client lists or other records. She stated that most of the patient records in her charge were in individual files in filing cabinets, not on a computer. When Guzman tendered her resignation to Apex, it was refused, but then she was terminated within days. The day

---

[2] Appellant filed an unopposed amended notice of appeal to include the trial court's temporary injunction order of August 8, 2013. This order, which is the active injunction order, is similar in all material terms to the temporary injunction order of January 17, 2013. We treat this appeal as from the subsequent order and treat actions relating to the appeal of the first order as relating to the appeal of the subsequent order. TEX. R. APP. P. 27.3.

she was terminated, she was accompanied to her desk, allowed to collect her personal effects, and was escorted off the premises.

The August 2, 2012 hearing was continued until August 16, 2012, when multiple witnesses testified. The trial court extended the temporary restraining order on August 22, 2012. Further hearings occurred on September 4, 2012 and October 1, 2012, when the trial court again extended the temporary restraining order "until further order of the court." The hearing resumed on November 19, 2012. Before this hearing, counsel for Apex withdrew. On January 17, 2013, another and final hearing was held on the temporary injunction which the trial court then granted and signed. August 8, 2013, the trial court reiterated the temporary injunction.

## II. STANDARD OF REVIEW

The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (citing *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993); *Electronic Data Sys. Corp. v. Powell*, 508 S.W.2d 137, 139 (Tex. Civ. App.—Dallas 1974, no writ)). A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Walling,* 863 S.W.2d at 57. To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Id.*; *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Canteen Corp. v. Republic of Tex. Props., Inc.*, 773 S.W.2d 398, 401 (Tex. App.—Dallas

3

1989, no writ).

The standard of review for the grant or denial of a temporary injunction is abuse of discretion. *Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 716 (Tex. App.—Corpus Christi 2001, no pet.) (citing *Walling*, 863 S.W.2d at 58; *Tenet Health Ltd. v. Zamora*, 13 S.W.3d 464, 468 (Tex. App.—Corpus Christi 2000, pet. dism'd., w.o.j.)). A trial court abuses its discretion when it acts arbitrarily and unreasonably, without reference to guiding rules or principles, or misapplies the law to the established facts of the case. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). There is no abuse of discretion where the court bases its decision on conflicting evidence. *General Tire, Inc. v. Kepple*, 970 S.W.2d 520, 526 (Tex. 1998); *Zamora*, 13 S.W.3d at 468. We do not give any particular deference to legal conclusions of the trial court and apply a de novo standard of review when the issue turns on a pure question of law. *Zamora*, 13 S.W.3d at 468; *see State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996).

The probable injury element requires a showing that the harm is imminent, the injury would be irreparable, and that the plaintiff has no other adequate legal remedy. *Zamora*, 13 S.W.3d at 468. Although an injunction is a preventive device, injunctive relief is improper where the party seeking the injunction has mere fear or apprehension of the possibility of injury. *Frey v. DeCordova Bend Estates Owners Ass'n*, 647 S.W.2d 246, 248 (Tex. 1983). A prerequisite for injunctive relief is actual injury, the threat of imminent harm, or another's demonstrable intent to do that for which injunctive relief is sought. *Tri-State Pipe and Equip., Inc. v. S. Cnty. Mut. Ins. Co.,* 8 S.W.3d 394, 401 (Tex. App.—Texarkana 1999, no pet.).

"[A] trial court abuses its discretion by entering an 'overly-broad' injunction which

4

grants 'more relief' than a plaintiff is entitled to by enjoining a defendant from conducting lawful activities or from exercising legal rights." *Harbor Perfusion,* 45 S.W.3d at 717, (citing *Fairfield Estates L.P. v. Griffin*, 986 S.W.2d 719, 723 (Tex. App.—Eastland 1999, no pet.); *The Republican Party of Texas v. Dietz,* 940 S.W.2d 86, 93 (Tex. 1997); *Villalobos v. Holguin*, 208 S.W.2d 871, 875 (Tex. 1948); *Ghidoni v. Stone Oak*, Inc., 966 S.W.2d 573, 583 Tex. App.—San Antonio 1998, no writ)).

### III.   IRREPARABLE HARM

### A.  Background

Apex's contention that it would suffer irreparable harm relied and centered on the testimony of its owner and president, Heraclio Eric Flores.   He testified at the August 15, 2012 and January 17, 2013 hearings.   Flores asserted that he began losing clients (approximately forty to fifty) to Legacy after Guzman left his employment.   According to the record, Guzman left in September of 2009, but did not begin her employment with Legacy until August 2010.   Flores's testimony does not inform us as to which clients left, when they left, or specifically why each left.   Flores did not speak with his departing or departed clients who allegedly went with Legacy.   Flores stated that when he started losing clients, perhaps as many as twenty, he called Guzman and spoke with her. Guzman told Flores she was just doing her job, and when he threatened to file a lawsuit or take it up with Legacy, she told him to do whatever he thought he could do.   Flores then testified that he suddenly lost three or four more unnamed clients within the next three or four days.   Flores stated his business has a "very small profit margin" and losing fifty or more clients would have a "very detrimental effect" on the business. "It means you can—you run the risk of being shut down."   However, as Legacy notes,

5

Apex never lost fifty clients all at once and indeed Flores stated most of the losses were gradual.

Flores first testified at the August 16, 2012 hearing that he had about 1,400 to 1,500 clients for the several years ending in August 2012. In his testimony at the January 2013 hearing, he indicated he had about 1,300 to 1,400 clients. He further testified he would get one or two transfers in from other agencies and perhaps five to ten transfers out. "Averages anywhere from maybe five to sometimes, I don't know, maybe ten." However, he also stated Apex would receive thirty to fifty new clients from the State and HMOs each month.

According to Flores, for the period spanning August 2009 to August 2012, Apex lost about eight clients to Healing Touch Home Health, thirty-five to Amistad Home Health, seventeen to In House Health Care, and about forty or fifty to Legacy.[3] Apex also sued and sought injunctions against Amistad. Flores complained and his counsel argued that because Legacy advertised higher pay for the attendant providers, the providers would leave and often take their clients with them. Apex paid their providers approximately $7.50 or $8.00 per hour, and Legacy paid their providers about $9.00 per hour. Apex argued that providers would be lured away to Legacy for higher pay, and in turn, clients would follow the provider/attendant to Legacy.

Under cross-examination, Flores admitted he could determine exactly how much money he lost for each client that transferred to another agency. He estimated that Apex lost $500,000 to $600,000 in (gross) revenues for the clients lost to Legacy.

---

[3] Apex's counsel suggested to Flores that the number lost to Legacy was thirty-two, perhaps thirty-three. The rate of loss would average from less than one per month to 1.4 per month, approximately the same loss ratio as Amistad.

Flores could calculate his loss based upon the service-hour reimbursements Apex received per client.   The State or HMO paid the reimbursements, not the client.

## B.   Analysis

"An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204; *Reach Group, L.L.C. v. Angelina Group*, 173 S.W.3d 834, 838 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *see Cardinal Health Staffing Network, Inc v. Bowen*, 106 S.W.3d 230, 235 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (quoting *Butnaru*, 84 S.W.3d at 204); *Tom James Co. v. Mendrop*, 819 S.W.2d 251, 253 (Tex. App.—Fort Worth 1991, no writ) ("An injunction will not issue if damages are sufficient to compensate the plaintiff for any wrong committed by the defendant and if the damages are subject to measurement by an ascertainable pecuniary standard.").   The party requesting the injunction has the burden to establish that there is no adequate remedy at law for damages.   *Cardinal Health*, 106 S.W.3d at 235.   An adequate remedy at law is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief.   *Id.*

In *Reach*, the record showed:

'You have a way to calculate those numbers, right?'; Massey replied, 'Yes.' Massey's testimony clearly established that any damages resulting from appellees taking Transocean's or BP's business away from TRG were capable of precise measurement. Massey further testified that if appellees are allowed to continue to solicit TRG's past, current, and potential clients, TRG could be put at 'great risk.'   This latter testimony, however, 'established only fear of possible injury,' and such a contingency 'is not sufficient to support issuance of a temporary injunction.'

*Reach*, 173 S.W.3d at 838 (citing *EMSL Analytical, Inc. v. Younker*, 154 S.W.3d 693, 697 (Tex. App.—Houston [14th Dist.] 2004, no pet.)).

Apex argues from *Walling* that a particular calculation of damages is no bar to a temporary injunction. *See Walling*, 863 S.W.2d at 58. The actual holding in *Walling* dealt with a failure to plead equitable relief and "[t]he court of appeals was also in error in ruling on the adequacy of Walling's pleadings at all. We have held repeatedly that the courts of appeals may not reverse the judgment of a trial court for a reason not raised in a point of error." *Id.* (citing *Vawter v. Garvey*, 786 S.W.2d 263, 264 (Tex. 1990); *San Jacinto River Auth. v. Duke*, 783 S.W.2d 209, 210 (Tex. 1990)). Furthermore, in *Walling*, the plaintiff stood to lose his contractual option to buy the business absent the temporary injunction. *Id.* at 56–57.

Apex cites *Liberty Mutual Insurance Co. v. Mustang Tractor & Equipment Co.*, 812 S.W.2d 663, 666–67 (Tex. App.—Houston [14th Dist.] 1991, no writ), for the proposition that business disruption can be irreparable harm. First, if Liberty Mutual had been able to refuse to defend the claim in question, Bache Halsey would have no adequate remedy at law because their damages would be limited to policy limits. *Id.* at 666. Second, damages "would be insufficient to cover a loss of forty-seven million dollars in financing and an inability to procure additional financing." *Id.* at 666–67. In other words, Bache Halsey's business would be shut down due to lack of financing.

Apex similarly argues: "The damage award may come too late to save the plaintiff's business. He may go broke while waiting, or may have to shut down his business but without declaring bankruptcy." *See Roland Machinery Co. v. Dresser Ind., Inc.*, 749 F.2d 380, 386 (7th Cir. Ill. 1984). But in the same paragraph, the 7th Circuit illustrates its holding in a Ford dealer termination case where Judge Friendly says: "But the right to continue a business in which William Semmes had engaged for twenty years

8

and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damage award." *Id.* (citing *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2nd Cir. 1970)). Apex cannot compare its situation to the total loss of a dealership franchise.

In *Roland*, Judge Posner outlines some of the conflicting standards applicable to temporary injunctions. *See* 749 F.2d at 382-91. However, the holding reverses the trial court's grant of an injunction because the judge in the case made a clearly erroneous finding of fact that Roland probably would go out of business if the injunction was not issued and he committed an error of law when he failed to consider the possible impact on competition of the provision of the injunction that froze Dresser's market share until the end of the lawsuit. *Id.* at 392.

Apex also cites *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 427 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Here the Houston court concluded:

> From this evidence, it was within the trial court's discretion to infer that appellants' misuse of Vinmar's trade secrets threatened Vinmar with the total loss of its very profitable isoprene business. There was also evidence in the record that appellants' misuse of Vinmar's trade secrets similarly threatened Vinmar's caprolactum business in Mexico and Belarus.

*Id.* The court also noted that the potential damage caused by the loss of Vinmar's isoprene and caprolactum business, even if not complete, cannot be easily calculated and therefore a legal remedy is inadequate. *Id.* Again, our case is distinguishable.

Apex cites *Xenon Anesthesia v. Xenon Health LLC*, No. 09-12-00553-CV, 2013 WL 1279408 at *3 (Tex. App.—Beaumont, March 29, 2013, no pet. h.) (mem. op.). Xenon Anesthesia holds that the actions taken in direct violation of the contract between

9

the two related anesthesia management groups threatened the business reputation and goodwill of Xenon Texas, jeopardized its relationship with its clients, and any transfer of interest or assets would harm appellees' business. *Id.* Dr. Chandhry, who controlled Xenon Health, contracted to set up Xenon Anesthesia of Texas with Dr. Kahn in order to provide Chandhry time to obtain necessary Texas licenses and form a Texas professional corporation. *Id.* at *2. Their agreement provided that Kahn would sell his interest to Chandhry when the license was obtained. *Id.* However, according to the testimony, Kahn suspended the agreement, removed Chandhry from the accounts, and refused to honor the sales agreement. *Id.* Further, Kahn told clients he would be taking over the day to day management of the organization. *Id*. at *3. In other words, Kahn was allegedly taking over an entire business that by contract should be owned and controlled by Chandhry. The case is clearly distinguishable on the merits.

Apex also cites *Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 389–90 (Tex. 2008), as permitting expert testimony of damages on less support than Apex provided—including where the record doesn't show how the expert arrived at his damage estimates. *Id.* While this may be partially true, as a registered nurse, Flores was neither proffered as an expert nor shown to be so in the record. Furthermore, the high court noted that the testimony was not unreliable, conclusory or speculative. *Id.* The expert did not simply state a conclusion without any explanation or ask the jurors to "take my word for it." *Id.* While the witness's calculations did not include "an explicit discount rate," it included an implicit return for risk and interest because the well was expected to produce for substantially more than eight years. *Id.* Failure to use an explicit discount rate might undermine expert testimony in other cases

10

but "payouts" in the oil and gas business are often "calculated in precisely this manner." *Id.* The testimony of Flores in no way compares to the significantly more expansive and explicit expert testimony in *Arkoma*.

The opinion testimony given by Flores on behalf of his company is conclusory and speculative. Flores opined his profit margins were "very small" but gave no figures or other factual data to back up this conclusion. Similarly, he opined he would be "driven out of business" without offering supporting data. He stated he had lost $500,000 or $600,000 due to "Legacy's filching of clients." The figures are obviously gross revenues, not supported by proof of clients actually lost, and cannot support loss of net profit, if any. *See Kellmann v. Workstation Integrations, Inc.*, 332 S.W.3d 679, 684 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Lost profit estimates or opinions must be based on objective facts, figures, or data from which the lost profits amount may be ascertained. *Id.* (citing *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010)). "The calculation of lost-profits damages must be based on net profits, not gross revenue or gross profits." *Id.* The supreme court instructs, for example, that even "property valuations may not be based solely on a property owner's ipse dixit." *Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 159 (Tex. 2012). The witness "must provide the factual basis on which his opinion rests." *Id.*

Flores opined he could not make overhead if he lost fifty clients "all at once, or throughout a short period of time." Yet Flores himself stated his losses to Legacy were gradual except in the few days following his conversation with Guzman. Again, in the context of getting thirty to fifty new clients every month from the State and HMOs, this conclusory speculation is unsupported by any factual basis. *See id.*; *see also Reach*

11

*Group*, 173 S.W.3d at 838 (testimony that if appellees are allowed to continue to solicit TRG's past, current, and potential clients, TRG could be put at "great risk" established only "a fear of possible injury," and such a contingency "is not sufficient to support issuance of a temporary injunction"). Flores also opined that with a small profit margin, the loss of fifty clients (out of 1,300 to 1,500) would have a "very detrimental effect." "You can't pay your payroll taxes, you can't pay your employee taxes, you can't pay your bills. It means you can—you run the risk of being shut down." However, as we noted above, for the period from August 2009 to August 2012, Apex lost about eight clients to Healing Touch Home Health, thirty-five to Amistad Home Health, seventeen to In House Health Care, and approximately forty or fifty to Legacy. Flores simply furnished no records or data to support his conclusory opinion that he might be shut down.

A trial court abuses its discretion in granting a temporary injunction unless "it is clearly established by the facts that one seeking such relief is threatened with an actual irreparable injury if the injunction is not granted." *Markel v. World Flight, Inc.*, 938 S.W.2d 74, 80 (Tex. App.—San Antonio 1996, no pet.) (quoting *Dallas Gen. Drivers v. Wamix, Inc.*, 295 S.W.2d 873, 879 (Tex. 1956)). And evidence of fear, apprehension, and possibilities is not sufficient to establish any injury, let alone irreparable injury. *Id.* at 79–80. To demonstrate probable injury or harm, an applicant must show an injury for which there can be no real legal measure of damages or none that can be determined with a sufficient degree of certainty, *i.e.*, a noncompensable injury. *Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 925–26 (Tex. App.—Dallas 2006, no pet.).

12

Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact "more probable or less probable." *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004); *see* TEX. R. EVID. 401. The supreme court has labeled such testimony as "incompetent evidence," and has often held that such conclusory testimony cannot support a judgment. *Cas. Underwriters v. Rhone*, 132 S.W.2d 97, 99 (Tex. 1939) (holding that a witness's statements were "but bare conclusions and therefore incompetent").

Viewing the evidence in the light most favorable to the trial court's order, we hold that Apex failed to establish it faced probable, imminent, and irreparable injury in the absence of a temporary injunction.

## IV. OVERLY BROAD

Legacy also contends that the trial court's injunction writ is overbroad because its terms include lawful acts. The order's clauses "a," "c," and "d" prohibit Legacy from persuading, directly or indirectly encouraging or suggesting that an Apex client contact Legacy or change agencies. By prohibiting lawful speech these clauses are overly broad. *See* TEX. R. CIV. P. 683; *Harbor Perfusi*on, 45 S.W. 3d at 718. Clause "f" precludes Legacy from taking undefined "unlawful action" against employees of Apex. The clause does not identify specific unlawful acts and is thus improper in part. *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435–36 (1941) (holding that the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation

13

unlike and unrelated to that with which he was originally charged).

Clause "g" changes the status quo by requiring Legacy to give three days advance notice to Apex that one of its clients wishes to transfer to Legacy. Flores testified he ordinarily had one to several days notice when a client was moving to a new agency. Thus, this clause lacks evidence of probable and imminent injury and again is improper. *Kotz v. Imperial Capital Bank*, 319 W.W.3d 54, 56 (Tex. App.—San Antonio, 2010, no pet.).

## V. CONCLUSION

For the reasons stated, we reverse and remand. The temporary injunction against Legacy is dissolved.

DON WITTIG,
Justice

Delivered and filed the
19th day of September, 2013.

14