# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00012-CV

**MJAH Holdings, LLC, Appellant**

**v.**

**Andrew J. Henson, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
### NO. D-1-GN-15-003493, HONORABLE JAN SOIFER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

MJAH Holdings, LLC, appeals a take-nothing judgment rendered after a bench

trial in its suit against Andrew J. Henson arising out of disputes related to Henson's work for

MJAH. Although the trial court found that Henson breached his fiduciary duties to MJAH and

breached a consulting agreement executed by the parties, it awarded no damages arising from that

conduct. MJAH challenges the sufficiency of the evidence supporting the trial court's finding of

no damages. We will affirm.

## BACKGROUND

MJAH is a limited liability company owned by Mark Jansen, Andrew Henson, and

H-M Co.[1] The company was formed to lease commercial equipment used to pump and spread

hog manure as fertilizer on Midwestern farm fields. Jansen testified that the idea to form MJAH

---

[1] H-M Co. is a trust managed by Henry Gailliot.

originated when Henson suggested to him that it was a relatively simple business and that Henson had relationships with many farmers in the area. MJAH began operating in the spring of 2013. According to Jansen, in the summer of that year Henson suggested that the company pursue the additional line of business of providing the actual pumping and transfer services associated with moving hog manure from holding ponds and spreading it onto the fields. Jansen testified that MJAH purchased over a million dollars worth of heavy equipment, including John Deere tractors, manure bars, and hoses needed to perform the pumping and spreading services. MJAH purchased the equipment using financing arrangements with John Deere and loans from H-M Co., Gailliot, and Jansen. Jansen stated that the manure pumping business was more complex than simply leasing equipment and that it was important to have an "experienced player" involved. For this experience, Jansen relied on Henson and Ryan Kent, an acquaintance of Henson, who entered into a profit-sharing arrangement with MJAH. At trial, Jansen provided the following description of the business:

> This was a business that had a very mature market. There was collateral associated—it was a relatively safe investment in the sense that we had collateral associated with our investment. And so, you know, our ability to either realize a return if business went well was good and at the same time if things didn't go well we had a pathway for getting our money back.

In July 2013, Henson sent Jansen an email listing the names of seven potential customers and an estimate of the amount of manure to be pumped for each customer. According to Henson's estimate, these customers could provide an annual revenue of $907,200.[2] Henson stated in his email that he and Kent "would personally get each and every customer to sign a contract."

---

[2] This calculation was based on charging 0.018 cents per gallon pumped.

Henson sent additional forecasts for business in the fall of 2014 and again in the spring of 2015. Jansen testified that he relied on Henson's customer lists to project MJAH's revenues. According to Jansen, the "projections looked promising" and "at least in some instances [MJAH] had contracts with some of the individuals."

In March of 2015, Jansen emailed Henson to inquire about a number of items, including "the status of the bank financing and [Henson's] plan to pay off the debt that the company has." Henson responded:

> The company shows too much debt (John Deere and Investors). The company is also showing no cash flow. The calculations of the company have shown a Negative net balance for the second year in a row. The depreciation is not making it possible to Actually roll back over 25%. When the depreciation ends there will be a large gain, at that time I will have invested enough to make that year which will not be allowed anymore depreciation to roll over what is needed to be 60% owner in the company. This year I will take all earnings from harvesting, which is showing to be more than expected, and send that amount to MJAH Holding LLC. Estimating $120,000 this year (2015). Percent will increase to 37% (2015). This year we will show a Positive Net Balance. I will make sure the investment is made before the end of the fall season to show the 37% so the Percent can be rolled back into the company making my personal investment close to $200,000 this year. I will try to pull in more customers over the summer months to prolong the length of the fall season to increase our Net Gains.
>
> Hopefully by the end of the Spring Season 2016 I will be at 60% ownership and when I do get to that point I will use my earnings to pay the debt off that the company has (Investments and JOHN DEERE). Lets hit these numbers this year and we can pay the debt off fast.[3]

(Capitalizations in original).

---

[3] Jansen testified that the long range plan was to have Henson invest in the business over time to eliminate MJAH's debt and "ultimately leave him as the entrepreneur, running the business, owning most of the company." According to Jansen, at that point he and Gailliot would no longer be involved in running the business but would "get to participate essentially in [Henson's] good fortune."

Jansen testified that Henson's promises to pay down the company debt and increase his ownership percentage did not materialize.[4] Jansen also testified that MJAH never "actually hit [the] numbers" Henson had forecasted, although the company was "kind of moving in the right direction."

Jansen testified that the projection was that MJAH would generate revenue of between $800,000 and $1 million per year, allowing it to pay off its entire debt in four years. Assuming that plan came to fruition, Jansen estimated that MJAH would have more than $300,000 available for distributions. In actuality, however, according to Jensen "the wheels started to come off" in 2015 and the company "ended up seeing a bunch of things that we hadn't expected." Jansen stated that Henson represented to him that MJAH had hundreds of thousands of dollars in billings but that "the money wasn't coming in" and he grew concerned about MJAH's ability to make payments to vendors and secured creditors such as John Deere. Ultimately, Jansen instructed Henson to stop using MJAH's equipment because the company was going to transfer it to Kent, who Jansen believed to be a capable operator. Jansen testified, however, that he was unable to locate or recover the company's equipment. Eventually, Henson gathered the equipment he could find and it was sold at prices substantially below what MJAH had paid for it. Jansen testified that he was told that the proceeds of the sale of equipment were used to satisfy MJAH's debt.

Henson also testified at trial regarding MJAH's operations. Henson stated that he encountered problems conducting company business because MJAH had no operating cash. According to Henson, there were instances when MJAH could not provide services for the next

---

[4] Jansen stated, "[Henson] just kept saying, you know, it's coming, you know, he's inheriting land, or he's selling the crops or something. But he just kept telling us it was coming, but it never actually did."

customer because Henson had no money available to him. Henson testified that there were numerous bills that he sent to Jansen for payment that were not timely paid, including bills for equipment repair. Henson testified that without this equipment, he could not pump manure from the holding tanks. Henson stated:

> I couldn't afford for hotel rooms. I couldn't afford for fuel to get back to the jobsite. And there's times where . . . I couldn't even afford . . . food for myself when we're doing these large jobs. There was a large job in Minnesota that got—weather related, that froze over and eventually thawed back out a little bit, but . . . we probably could have done a little bit more work there if there was some operating cash flow and bills were paid on time to get this equipment available to do the job.

Henson testified that the problem with bills not being paid, which he attributed to Jansen, began in 2013 and continued through 2014 and 2015.

With regard to the business prospects Henson identified to Jansen at the outset of operations, Henson testified that he had been overly optimistic in projecting that MJAH could do annual business of a million dollars in 2013, 2014, and 2015. Henson stated that he was "excited to come into the business" and that he looked at a map and "just basically wrote down [] the maxes of all the manure application that could possibly happen, and didn't count in for [] all the elements of surprise." Henson stated that he had not taken into account weather and labor factors. With regard to the 2014 projections, Henson stated that he had not anticipated that one of the company's tractors would get hit by lightning and remain unrepaired. Similarly, Henson's 2015 business projections were based on the assumption that this tractor would be operable, and it was not. When asked about the damage calculation presented by Jansen, Henson agreed that the calculation did not include any

5

cost of replacing equipment or purchasing new equipment, which would have been necessary to continue operations.

Jansen provided the only testimony regarding the damages he alleged MJAH suffered as the result of Henson's conduct. Starting with a company growth rate of 100 percent after the first year, Jansen extrapolated MJAH's growth rate several years into the future and then reduced the expected growth rate over time. Jansen testified that he valued MJAH not only based on its own actual performance, but also attempted to compare it to "industry comparables." Jansen testified that Henson caused the company to fail and that the lost business value for the company was approximately $1.6 million. Jansen arrived at this number by using three methodologies to calculate the value of MJAH as an enterprise and averaging the three values, arriving at $1.639 million. The first methodology, which Jansen called the "S&P Methodology," assigned a business value to MJAH by multiplying a projected rolling twelve-month EBIDTA[5] for the second quarter of 2016 by the S&P 500[6] price-to-cash flow multiple for June 2016 and discounting the resulting value by 50%.[7] The S&P Methodology valued MJAH at $2.073 million. The second methodology, which Jansen called the "Comparable Methodology," assigned a business value to MJAH by multiplying the same projected EBIDTA for MJAH by the price-to-cash flow multiple of a comparable company. As a

---

[5] The initialism "EBIDTA" stands for "earnings before interest, depreciation, taxes, and amortization."

[6] The S&P 500 is an American stock market index based on the market capitalizations of 500 large companies having common stock listed on the NYSE, NASDAQ, or the Cboe BZX Exchange. *See* S&P 500 Index, https://en.wikipedia.org/wiki/S%26P_500_Index (last visited March 27, 2019).

[7] Jansen testified that he discounted by 50% to reflect that MJAH was not a publicly traded company, was illiquid, and faced greater risk factors than those included in the S&P 500 average.

comparable company, Jansen chose United Rentals, a publicly traded company that Jansen contended was similar to MJAH because both companies rented large pieces of equipment.[8] The Comparable Methodology valued MJAH at $1.131 million. The third methodology, which Jansen called the "Discounted Cash Flow Methodology," applied a 25% discount rate to the projected cash flows of MJAH assuming a three percent growth rate and then assigned a value for the company equal to the aggregate amount of those cash flows. The Discounted Cash Flow Methodology valued MJAH at $1.713 million. Jansen testified that the lost business value of MJAH was the average of these three numbers—$1.639 million.

During cross-examination, Jansen was asked about MJAH's profitability from a tax standpoint. He testified that in 2013, MJAH showed ordinary business income of negative $114,309. Jansen also stated that he imagined that MJAH's tax returns for 2014 and 2015 also showed business losses.

At the conclusion of trial, the trial court signed a judgment that included its findings that, although Henson breached the Management and Consulting Agreement and breached his fiduciary duties to MJAH, his conduct did not constitute fraud or conversion. The trial court further found that MJAH had not substantiated its claims for damages resulting from Henson's breach of the agreement or of his fiduciary duties to MJAH. The trial court rendered judgment that MJAH take nothing by way of its claims against Henson and filed findings of fact and conclusions of law. This appeal followed. MJAH's two issues reduce to a challenge to the factual sufficiency of the

---

[8] One of MJAH's exhibits describes United Rentals, Inc. as an equipment rental company founded in 1997 that operates 897 rental locations in the United States and Canada.

evidence supporting the trial court's failure to find that MJAH suffered $1.639 million in damages resulting from Henson's conduct.

## DISCUSSION

In an appeal from a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the factual sufficiency of the evidence to support them as we would review a jury's findings. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). In reviewing a factual-sufficiency challenge, we examine the entire record and consider and weigh all the evidence, both in support of and contrary to the challenged finding. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). When, as here, a party attacks the factual sufficiency of the evidence supporting an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Urista v. Bed, Bath & Beyond, Inc.*, 245 S.W.3d 591, 601 (Tex. App.—Houston [1st Dist.] 2007, no pet.). We review the trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Although an appellant may not challenge a trial court's conclusions of law for factual sufficiency, we review de novo the trial court's legal conclusions drawn from the facts to determine whether the conclusions are correct.

With regard to MJAH's damages allegedly resulting from Henson's conduct, the court made the following findings:

FOF 10: Henson's revenue projections and forecasts were inaccurate, and by his own admission, "overly optimistic."

FOF 11: MJAH was never profitable.

8

FOF 12: One problem was that Henson made revenue projections based on the lease or purchase of tractors and manure spreading equipment, some of which were never purchased or leased by MJAH, despite Henson's requests and recommendations.

FOF 18: Plaintiff MJAH failed to meet its burden of proof on how much money was invested in the company; how, when, and why the money was spent; how much money was received for services provided by the company; how the money received was accounted for; or who was at fault when certain of the equipment purchased and leased for the company was not recovered after MJAH terminated [Henson].

FOF 20: MJAH's damages were not substantiated.

FOF 21: Mark Jansen, an interested party, provided the only testimony or evidence of MJAH's damages, based upon comparisons and methodologies that were neither credible nor reliable. Specifically, Jansen developed a lost profit model for MJAH (which had never been profitable, was a service business operated in four states with no employees, and only engaged Henson as an independent contractor on a regular basis, with one to two people working for him), in part by comparing it to a publicly traded company, United Rentals, Inc. (which leases equipment, but does not provide any services), with some 897 branches in 49 states and 6 Canadian provinces, and 12,400 employees. His profit model also used two other methods (including comparisons to businesses in the S & P index) that were not credible or fair comparisons to MJAH. Jansen's opinion that MJAH had sustained lost profits and/or lost market value of $1.6 million was based upon speculation, improper and unfair comparisons, and methodologies that were not credible.

The trial court concluded that MJAH "did not prove its damages by competent, credible evidence."

On appeal, MJAH contends that the evidence is factually insufficient to support the trial court's damages findings. To prevail, MJAH must demonstrate that the trial court's finding is against the great weight and preponderance of the evidence presented at trial. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (party attacking factual sufficiency of evidence supporting adverse finding on which it had burden of proof must demonstrate that finding is against great weight and preponderance of evidence). We conclude MJAH has failed to do so.

9

MJAH first asserts that the trial court's failure to award damages for lost profits was against the great weight and preponderance of the evidence. MJAH presented the court with no evidence of lost profits; rather, the only testimony or evidence of MJAH's damages was Jansen's testimony regarding his business valuation of MJAH using the three methodologies he described. "Lost profits" are damages for the loss of net income to a business and, broadly speaking, reflect income from lost business activity less the expenses that would have been attributable to that activity. *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002). The calculation of lost-profits damages must be based on net profits, not gross revenue or gross profits. *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 n.1 (Tex. 1992); *Kellmann v. Workstation Integrations, Inc.*, 332 S.W.3d 679, 684 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The injured parties must do more than show that they suffered some lost profits. *See Holt Atherton Indus.*, 835 S.W.2d at 84. They must demonstrate the amount of the loss with reasonable certainty, by competent evidence. *Id.* What constitutes reasonably certain evidence of lost profits is a fact-intensive determination. *Id.* At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. *Id.* The bare assertion that contracts were lost does not demonstrate a reasonably certain, objective determination of lost profits. *Id.* at 85. To support the recovery of lost profits, the record must contain evidence sustaining one complete calculation of lost profits. *Id.* MJAH presented no such calculation, and the court's failure to award an amount of damages for lost profits was not against the great weight and preponderance of the evidence.

MJAH next argues that the trial court's failure to award damages for MJAH's lost business value was error. MJAH relies on *Sawyer v. Fitts*, 630 S.W.2d 872, 874-75 (Tex.

10

App.—Fort Worth 1982, no writ), in which the court held that, under Texas law, "the proper measure of damages for destruction of a business is measured by the difference between the value of the business before and after the injury or destruction." Even assuming, however, that MJAH's demise as a going concern was caused by Henson,[9] the trial court found that the business valuations presented by Jansen were not credible, mainly because they were based on businesses that were not comparable to MJAH. The evidence amply supports this finding. Finding no information on either publicly or nonpublicly traded manure spreading companies, Jansen turned to United Rentals, Inc. and a model based on the S&P 500, neither of which bear similarity to MJAH. Jansen, an interested party, provided no objective basis for the various discount rates he used in his calculations. The trial court's failure to award the $1.639 million Jansen sought as lost business value for MJAH was not against the great weight and preponderance of the evidence and, consequently, not error.

Additionally, in order to recover damages for lost profits or lost business value, MJAH was required to prove that its alleged injuries were caused by Henson's conduct. *See Hunter Bldgs. & Mfg., L.P. v. MBI Glob., L.L.C.*, 436 S.W.3d 9, 18 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (requiring direct causal link between lost-profits damages, actions of defendant, and injury suffered). In this case, there is at least disputed evidence on causation. Although Jansen blamed the business's failure on Henson's conduct, Henson testified that the company was underfunded to the extent that he was unable to purchase food and fuel or to make repairs to necessary equipment. To the extent Jansen ascribes the company's illiquidity to Henson's failure to make anticipated

---

[9] In that regard, we observe that there was evidence presented at trial that Henson was unable to successfully accomplish MJAH's business objectives due to a lack of cash flow to support day-to-day operations and the absence of necessary equipment.

capital contributions, the evidence at trial was that Henson had "options" to increase his ownership of MJAH through investments of capital, not that he was obligated to do so. To the extent the business model relied on Henson to inject capital into the company from money he earned from his own, unrelated, business activities, that goal was merely aspirational. There is evidence to support the conclusion that the MJAH business plan failed not because of Henson's breach of contract or of his fiduciary duties but, rather, was the predictable result of a strategy based largely on the predictions and abilities of an untested entrepreneur who was, by his own admission, overly optimistic about MJAH's prospects.

Finally, MJAH asserts that, because there was "objective evidence of injury," the trial court's failure to award any damages was against the great weight and preponderance of the evidence. MJAH points to testimony that Henson (1) failed to collect outstanding invoices; (2) engaged in competitive business activities using equipment owned by MJAH, which "literally took money out of MJAH's pocket"; (3) "potentially" obligated MJAH to hundreds of thousands of dollars in unauthorized equipment purchases; and (4) failed to deliver equipment to MJAH, which precluded its continued business operations. MJAH did not, however, quantify any of these alleged injuries as part of its evidence of damages, nor does it appear to have convinced the trial court that Henson's conduct caused MJAH's losses. Instead, MJAH relied solely on Jansen's testimony regarding lost business value and requested an award of $1.639 million based on that theory. The trial court was not asked at trial to award damages for the categories of injuries MJAH now identifies on appeal, nor did MJAH submit proposed findings of fact regarding these types of damages. There was no competent uncontroverted evidence admitted at trial from which a factfinder could determine the

amount of uncollected outstanding invoices, the amount of money Henson's allegedly competitive business activities "took out of MJAH's pocket," or the amount of the allegedly unauthorized equipment purchases. Assuming MJAH had preserved the alleged error, we cannot conclude on this record that the trial court's failure to award damages for these categories of alleged injuries was against the great weight and preponderance of the evidence.

## CONCLUSION

For the reasons stated in this opinion, we overrule MJAH's challenge to the sufficiency of the evidence supporting the trial court's failure to award damages to MJAH.[10] The trial court's judgment is affirmed.

_____

Chari L. Kelly, Justice

Before Chief Justice Rose, Justices Kelly and Smith

Affirmed

Filed: March 29, 2019

---

[10] Having overruled MJAH's challenges to the sufficiency of the evidence supporting the trial court's finding that MJAH failed to substantiate its damages, we need not address MJAH's alternative challenge to the trial court's conclusion that "Henson's conduct was excused by laches." *See* Tex. R. App. P. 47.1 (court of appeals opinion must address every issue raised and necessary to final disposition of appeal).