**Opinion issued October 31, 2024.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-21-00463-CV

———————————

**SHUFOOD LLC, JINGJING LIANG, LIN SONG AND JIEMIN CHEN,**
**Appellants**

**V.**

**RONG  LIU, Appellee**

---

**On Appeal from County Court at Law No. 3**
**Fort Bend County, Texas**
**Trial Court Case No. 19-CCV-065115**

---

## MEMORANDUM OPINION

Appellants JingJing Liang, Lin Song, and Jiemin Chen and Appellee Rong

Liu are members and managers of Appellant Shufood LLC, a Bangbang Chicken

Legend Brand franchise.  When Liu decided to withdraw from Shufood, Liu and

Shufood agreed that Liu would transfer her membership in the LLC to Shufood, and

in exchange, Shufood would return to Liu, in three installments, the $15,717 capital contribution she made to the LLC. When Shufood failed to pay the first installment, Liu sued Appellants Shufood, Liang, Chen, and Song for breach of the parties' withdrawal agreement. Appellants answered and asserted counterclaims against Liu for breach of contract, anticipatory repudiation of contract, breach of fiduciary duty, fraudulent inducement, fraud by non-disclosure, and violations of the Texas Uniform Trade Secrets Act. After a bench trial, the trial court rendered judgment in favor of Liu on her breach of contract claim against Appellants, and a take nothing judgment against Appellants on their counterclaims.

On appeal, Appellants argue (1) the trial court erred by rendering judgment in Liu's favor on her breach of contract claim against Liang, Chen, and Song because they were not parties to the withdrawal agreement, (2) the trial court erred by rendering judgment in Liu's favor on her breach of contract claim because Liu materially breached the withdrawal agreement before the first installment payment became due, and thus Shufood's failure to make the first installment was excused, and (3) the trial court erred in rendering a take nothing judgment against them on their counterclaims because there was sufficient evidence supporting each element of their counterclaims and their counterclaims for breach of fiduciary duty and violations of the Texas Uniform Trade Secrets Act are not dependent upon the enforceability of the withdrawal agreement.

2

We reverse the portion of the trial court's judgment rendering judgment against Appellants Liang, Chen, and Song for Liu's breach of contract claim, and we affirm the judgment in all other respects.

## Background

Appellant JingJing Liang and Appellee Rong Liu met through a public chat group Liu created on the social networking application WeChat. The members of Liu's WeChat group share a common interest in Chinese cuisine, particularly foods from the Chengdu region of China, which is famous for "the local native delicacies as well as spicy foods." Liang, who is from Chengdu, wanted to open an authentic restaurant in the Houston-area featuring foods hot and spicy foods from Chengdu.

In September 2018, Liang and Liu began discussing the possibility of opening a restaurant together that served authentic Chengdu dishes. Because Liang and Liu could not afford to start a restaurant business on their own, Liang asked Liu if she could invite two other people to invest in the proposed business and Liu agreed. Liang introduced Liu to Appellants Lin Song and Jiemin Chen. Liu, Liang, Song, and Chen agreed to form Shufood LLC for the purpose of opening a BangBang Chicken Legend Brand franchise. According to Liang, BangBang Chicken Legend is a famous and well-established food franchise in China.

On October 8, 2018, Shufood's Certificate of Formation was filed with the Texas Secretary of State. The certificate lists Liu, Liang, Chen, and Song as the

3

LLC's members and managers. Liu and Chen each invested $15,717.64 in Shufood, Liang invested $16,372.55, and Song invested $7,203.92.

Chen testified that in addition to their monetary contributions, Liu and Liang also contributed their respective WeChat food groups to the LLC for "advertising purposes" and they agreed to promote Shufood's menu in their respective groups. According to Liang, Liu contributed two WeChat groups, "Sister Rong Group Purchase" and "Guizhou Sister Rong Private Kitchen (610 Group)" whose members were from the Loop 610, Bellaire, and Texas Medical Center areas, and Liang contributed her group with members from the Katy area.

In preparation for opening Shufood's restaurant, Liang and Chen began working with Bangbang Chicken Headquarters to have materials designed and created for Shufood's restaurant, which would be remodeled and located in a food court inside a supermarket. In November 2018, Chen and Song traveled to Chengdu for kitchen training and dish preparation training. As part of their training, Chen and Song were given two books containing BangBang Chicken Legend's recipes, preparation skills, and business operations. Liang testified that Liu was not actively involved in the preparation efforts. According to Chen, when Shufood was preparing to open, Liu "stay[ed] at home or work[ed] at home" and, as far as Chen was aware, Liu was "selling some food at her house." Liang testified that she and

4

Chen were responsible for Shufood's marketing and advertising efforts, and Song and Liu worked in the kitchen and were responsible for food preparation.

On February 16, 2019, both Liang and Liu announced in their respective WeChat groups that Shufood's Bangbang Chicken franchise would be open for business in two weeks, and they began to distribute food samples to group members the following day. Shufood, which had a "trial sale" of limited items on February 17, 2019, officially opened for business in late February 2019. Liu, who did not attend the training session in China, was trained by Song when she began working in the kitchen on February 16, 2019.

Liang testified that on March 20, 2019, Liu told Liang that she wanted to withdraw from the LLC because the business required more of her time than she had expected, and she needed time to care for her child. Liu told Liang that she wanted Shufood to return her initial capital contribution because she needed the money to support her family. When Liang informed Chen and Song of Liu's decision to withdraw from the LLC and her request that Shufood return her capital investment, Chen objected to returning Liu's investment because the members' capital contributions were risk investments that had already been spent on the business. Chen later agreed to return Liu's investment because Liu claimed she was a single mother who needed time to be with her child and she needed the money to support her family. Liu's last day at Shufood was March 23, 2019.

On March 28, 2019, Liu and Shufood executed a Withdrawal Agreement. Shufood agreed that Liu would withdraw from Shufood in exchange for Liu's promise to refrain from engaging in any conduct "harmful" to Shufood, and Shufood would in turn repay Liu her initial capital contribution of $15,717 in three separate installments, with the first installment due on April 21, 2019. The Withdrawal Agreement was signed by Liu in her individual capacity and Liang in her capacity as Shufood's corporate representative. Article III of the Withdrawal Agreement states:

> After signing the agreement, [Liu] shall not do any conducts that are harmful to [Shufood] and shall protect all the interests of the company. [Liu] shall not use any production method and technique as authorized by Bangbang Chicken Legend, shall not make any products that are the same as authorized by Bangbang Chicken Legend, and shall abide by the relevant confidentiality agreements between the two parties regarding the operation of the company.

On April 4, 2019, Liu announced on her WeChat group that on April 5, 2019 her business, "Sister Rong of Guizhou," would begin selling dishes at Tea Bar, a store located one block from Shufood's restaurant. When, on April 18, 2019, a member of Liu's WeChat group asked Liu if she would be offering a dish named "spicy chicken paws," Liu responded that she was not currently offering that dish, but she would be offering it the following week.

On April 20, 2019, Liu came to Shufood's store during regular business hours and according to Appellants, made a scene. Liu demanded that Shufood pay her the

6

first installment due under the Withdrawal Agreement, even though it was not due until the next day, and she allegedly threatened to shut down Shufood's business operations if she was not paid the next day. Although the first installment was due on April 21, 2019 under the Withdrawal Agreement, Shufood did not pay the installment.

On May 22, 2019, Liu sued Appellants Shufood, Liang, Chen, and Song for breach of the Withdrawal Agreement based on their failure to make the first installment payment. She also asserted that Liang, Chen, and Song had fraudulently induced her to invest in Shufood, claiming Liang, Chen, and Song had mistreated her and harassed her in "hopes of forcing her out of the business and [they] never planned to refund her investment."

Appellants answered and asserted counterclaims against Liu for breach of contract, anticipatory repudiation of contract, breach of fiduciary duty, fraudulent inducement, fraud by non-disclosure, and violations of the Texas Uniform Trade Secrets Act. ("TUTSA"). They argued that Liu had breached the Withdrawal Agreement by "harming Shufood's interest by unfair competition, misuse of trade secret, and interference of Shufood business," and that Liu had anticipatorily breached, or repudiated, her obligation under the Withdrawal Agreement "by harming Shufood's interest by unfair competition, misuse of Shufood trade secret, and interference of Shufood business." Appellants further asserted that Liu had

breached her fiduciary duty to them by concealing information, providing false information, self-dealing without disclosure, failure to disclose her own business transaction with Tea Bar, and fraudulently inducing them to agree for her to retrieve her capital investment and harming their business interest at the end to seek self-interests. They alleged that Liu made numerous false representations to them to induce them to enter into the Withdrawal Agreement. According to Appellants, Liu had a duty to disclose to them "her plan to open her own restaurant" based on their fiduciary relationship and she had "a duty to disclose her business opening because the information was new and made [Liu's] earlier representation to [Appellants] false or misleading," and she had a duty to disclose this information because her partial disclosure of her reasons for leaving Shufood "created a substantially false impression."

## Bench Trial

The trial court conducted a bench trial. Liu, whose testimony was brief and limited in scope, testified that she met Liang on WeChat. According to Liu, Liang asked whether she was interested in investing in a Bangbang Chicken Legend franchise and she introduced Liu to Chen and Song. Liu testified that she had to borrow $15,717 to invest in Shufood.

Liu testified that she and Song worked in Shufood's kitchen. Song was responsible for marinating the food and after the food was cooked, Liu was

8

responsible for cutting and packaging the dishes. Liu, who denied cooking the food, testified that she helped prepare the dishes, but she did not know their ingredients. She also did not know which dish Shufood claimed she had misappropriated.

Although the trial transcript does not indicate which question she was responding to, Liu testified, "I got the money and I need to support my family because I'm a single parent." Liu testified that the Withdrawal Agreement did not contain a "noncompete clause" or prohibit her from opening a restaurant within a certain distance of Shufood.

During cross examination, Liu testified that she and Shufood were the only parties to the Withdrawal Agreement, and she never signed an agreement with Liang, Chen, and Song. That was the extent of Liu's testimony. Shufood's counsel told the trial court that Liu was one of her witnesses and she was reserving further questions for her case in chief. Liu, however, was not recalled to the stand during Shufood's case in chief.[1]

Liang testified that Chen and Song brought back books with them when they returned from their training in China. According to Liang, the books contain the ingredients for each of BangBang Chicken Legend's dishes, and the preparation technique and method used to prepare the company's specialty dishes. While Liang

---

[1] Liu did not testify to any new facts during her one-page testimony on redirect examination.

9

testified that the content of the books is a trade secret, she also testified that the members of Shufood were not required to sign a confidentiality agreement. The LLC's members, including Liu, however, were nevertheless required to maintain the confidentiality of the information contained in the books because according to Liang, all the members had read the books and "on page 1 of that book, it said all the readers have to keep secret regarding the materials and contents of this book." Liang testified that the book with the confidentiality language was "directly provided to [Liu] because it was placed at the public area at work, so that we can all read it together." Liang testified that the "book itself is required to be kept confidential because it requires authorization from the company [Bangbang Chicken Legend] for the people to use it, so the book itself is required to be kept confidential." Liang acknowledged that Liu would be bound by the book's confidentiality clause only if she read the book. Liang testified that Liu had copied some of Shufood's dishes. When asked how she knew Liu had copied the dishes, Liang testified that she knew from the "picture in some consumer feedback." She testified she knew from "the feedback of the consumers or customers that they send out that we can see from the pictures and also the feedback that those dishes are very close to the dishes that we make." Liang, who admitted she had never tasted any of Liu's dishes and did not know what ingredients she used in her dishes, also testified that she knew Liu had copied Shufood's dishes because the "appearance or the look of [her] dishes they

10

look very, very close to ours," and "from reading the name of the dishes and also the contents of the dishes that has a very similar dishes that we have in our restaurant." Although the dishes were not identical, Liang testified that Liu had copied Shufood's dishes because Liu used "the same procedures and the recipe and ingredients" as Shufood. She testified that Liu had worked in Shufood's kitchen for approximately twenty days, and she knew "all the ingredients, the recipes, cooking methods, and procedures of Bang Bang Chicken" and it was "very possible that [Liu] has . . . the ability to cook exactly the dishes as what we were authorized from Bang Bang Chicken."

Liang also testified as Shufood's damages expert. She testified that Liu harmed Shufood by, among other things, opening a restaurant that made dishes "similar" to Shufood's menu items, using Shufood's trade secrets, and taking "away the members of the WeChat group, so that means that the members of the WeChat group will no longer order food from [Shufood]." Liang prepared a report which she contends demonstrates Shufood lost over $9,000 in sales due to Liu's harmful conduct. Liang did not include in her damage analysis any of Shufood's actual sales for the period prior to Liu's departure. She instead calculated Shufood's damages by comparing Shufood's sales in two delivery regions for a period of one year after Liu's departure.

Chen testified that she and Song attended a one-week training course in China where they were trained "about the branding, marinating process and also the cutting and plate or the garnish method, which is different from the ordinary method." According to Chen, Liu and Liang contributed their individual WeChat groups to Shufood, and Chen is member of all three groups. Chen testified that Liu was not involved in the opening of Shufood, and before Shufood opened in February 2019, Liu had been "stay[ing] at home or working at home because as far as I know she was selling some food at her house." Chen testified that Liu cut and separated the food and did some of the stir frying, and Liu needed to know some of Shufood's trade secrets to do that.

Chen testified that several of the dishes listed on the menu Liu posted on the WeChat group were "similar" to dishes Shufood offered. According to Chen, Liu not only opened a restaurant that sold dishes "similar" to Shufood's dishes, she also "took away the members of the WeChat group, so that means that the members of the WeChat group will no longer order food from us." Chen testified that a member of Liu's WeChat group asked Liu if she would be offering a dish named "spicy chicken paws," and Liu responded that she was not currently offering that dish, but would do so the next week. According to Chen, she taught Liu to make Shufood's "spicy chicken paws," which is one of Bang Bang Chicken Legend's specialty items,

12

and it requires knowledge of Bang Bang Chicken Legend's confidential information, including the ingredients, method, and techniques used to prepare the dish.

When asked how she knew Liu was preparing the same or similar dishes or using the same processes or cooking methods as Shufood, Chen testified that one of Liu's dishes, the Sichuan peppercorn chicken, "is off the recipe of Bang Bang Chicken" and Chen was not aware of any other restaurant offering the dish. And he claimed that Liu had promised a group member that she would offer "spicy chicken paws" which is a dish that "requires special preparations and the method that we learned from China, so she utilize what we taught her to make her own foods."

On cross examination, Chen testified that they filed a certificate of formation for Shufood with the State of Texas, but they never signed an operating agreement. When asked about the Withdrawal Agreement, Chen testified that "the reason we allow[ed Liu] to withdraw [was] because she said she need[ed] to go home and tak[e] care of the kids and the money was needed, not that she could use the money to invest a new restaurant that has the similar with our restaurant."

Song testified that she worked in Shufood's kitchen and she was in charge of marinating the food. Song and Chen traveled to China for training. According to Song, the instructor gave her and Chen "some training materials and told us how to prepare and process of what we have to do." Liu, who worked in Shufood's kitchen, was involved in the "preparation process" and stir frying, and Song trained her using

13

the materials Song and Chen were provided during their training. According to Song, all the members of Shufood, including Liu, "read the material while we are preparing."

Song testified she did not know why Liu wanted to leave Shufood until after Liang signed the Withdrawal Agreement. Song, who is a member of Liu's WeChat group, learned that Liu was opening her own business when Liu announced it to the group members. The Tea Bar, where Liu announced she would open her restaurant, was located near Song's home. Song passed by the "store," but she did not go in. She did not see a restaurant sign or pay any attention to signs. Song testified she knew it was Liu's restaurant because a friend whose name Song could not remember told her it was Liu's restaurant.

After hearing the parties' closing arguments, the trial court rendered judgment in favor of Liu on her breach of contract claim against Appellants, and a take nothing judgment against Appellants on their counterclaims. This appeal followed.[2]

---

[2] Liu did not file an appellee's brief. When an appellee fails to file a brief, the appellate court should conduct an independent analysis of the merits of the appellant's claim of error, limited to the arguments raised by the appellant, to determine if there was error. *Burns v. Rochon*, 190 S.W.3d 263, 267 n. 1 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also Spencer v. Gilbert*, No. 03-09-00207-CV, 2010 WL 3064346, at *2 n.2 (Tex. App.—Austin Aug. 4, 2010, pet. dism'd w.o.j.) (noting that "appellees' outright failure to file a brief has no consequence set by rule except that failure to controvert a statement of fact will lead to the statement of fact being taken as true") (citing TEX. R. CIV. P. 38.1(g)).

In three issues, Appellants argue the trial court erred by (1) rendering judgment against Liang, Chen, and Song on Liu's breach of contract claim because they were not parties to the Withdrawal Agreement, (2) rendering judgment in favor of Liu on her breach of contract claim because Liu materially breached the Withdrawal Agreement first, and thus Shufood's failure to make the first installment payment was excused, and (3) rendering a take nothing judgment against them on their counterclaims because there was sufficient evidence supporting each element of their counterclaims and their counterclaims for breach of fiduciary duty and violations of TUTSA are not dependent upon the enforceability of the Withdrawal Agreement.

**Applicable Law**

**A.   Sufficiency of the Evidence**

Evidence is legally insufficient when (1) evidence of a vital fact is absent, (2) rules of law or evidence bar us from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 793 (Tex. 2020). More than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). There is less than a scintilla of evidence when the evidence is "so weak

15

as to do no more than create a mere surmise or suspicion" of a material fact. *Id.*; *see also Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (stating evidence offered to prove vital fact that does nothing more than "create a mere surmise or suspicion of its existence" does not meet scintilla standard and is no evidence at all).

When a party challenges the legal sufficiency of an adverse finding on an issue on which it bore the burden of proof at trial—such as a finding against a defendant on a counterclaim or an affirmative defense—that party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue, and the party may prevail on appeal only if no evidence supports the trial court's adverse finding and the contrary position is conclusively established. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). A matter is conclusively established "only if reasonable people could not differ as to the conclusion" to be drawn from the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

**B.      Contract Interpretation**

The interpretation of a contract involves questions of law we consider de novo. *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 387 (Tex. 2021) (citing *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018)). "[O]ur primary objective is to ascertain the parties' true intentions as expressed in the language they chose." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015); *see also Bd. of Regents of Univ. of Tex. Sys. v. IDEXX Labs., Inc.*,

16

691 S.W.3d 438, 439 (Tex. 2024) ("A contract is a written expression of the parties' intent."). "We ascertain that intent by giving words the meaning a reasonable person would afford them under the circumstances and by construing them within the contractual context as a whole, not in isolation." *Northland Indus., Inc. v. Kouba*, 620 S.W.3d 411, 415 (Tex. 2020); *see also IDEXX Labs., Inc.*, 691 S.W.3d at 443–44 ("The interpreting court must decide whether the meaning of the text read in context is genuinely uncertain or whether one reasonable meaning clearly emerges.").

## C.    Breach of Contract

To prevail on its breach of contract claim, a party must establish (1) a valid contract; (2) performance or tendered performance under the contract; (3) a breach by the defendant; and (4) damages resulting from the breach. *Woodhaven Partners, Ltd. v. Shamoun & Norman, L.L.P.*, 422 S.W.3d 821, 837 (Tex. App.—Dallas 2014, no pet.). When one party to a contract commits a material breach of the contract, the other party is discharged or excused from further performance. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."); *Gulshan Enters., Inc. v. Zafar, Inc.*, 530 S.W.3d 298, 303 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("When one party to a contract commits

17

a material breach of that contract, the other party is discharged or excused from further performance.").

The contention that a party to a contract is excused from further performance because of a prior material breach by the other contracting party is an affirmative defense which must be pleaded and proved. *See* TEX. R. CIV. P. 94; *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006). A party waives an affirmative defense if it is not pleaded or tried by consent. *See Frazier v. Havens*, 102 S.W.3d 406, 411 (Tex. App.—Houston [14th Dist.] 2003, no pet.).[3]

## Privity of Contract

In their first issue, Liang, Chen, and Song argue the trial court erred by rendering judgment against them on Liu's breach of contract claim because they were not parties to the Withdrawal Agreement. Generally, "the benefits and burdens of a contract belong solely to the contracting parties, and 'no person can sue upon a contract except he be a party to or in privity with it.'" *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017) (citation omitted). Privity is established by proof that the defendant was a party to an enforceable contract with either the plaintiff or a party who assigned its cause of action to the plaintiff. *OAIC Commercial Assets, L.L.C. v. Stonegate Vill. L.P.*, 234 S.W.3d 726, 738 (Tex. App.—Dallas 2007, pet.

---

[3] Although Appellants did not plead any affirmative defenses, it appears that their prior material breach defense was tried by consent.

18

denied); *see also Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907, 912 (Tex. App.—Dallas 2008, no pet.) ("Privity is an essential element for recovery in any action based on contract; a breach of contract action normally requires privity between the injured party and the party sought to be held liable.").

It is undisputed that Liu and Shufood are the only parties to the Withdrawal Agreement and that although Liang signed the Withdrawal Agreement, she signed it only on behalf of Shufood and not in her individual capacity. *See Steer Wealth Mgmt., LLC v. Denson*, 537 S.W.3d 558, 567 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (stating limited liability companies are legal entities separate from their members). It is also undisputed that Chen and Song are not parties to and never signed the Withdrawal Agreement. Liu also testified that she did not sign any agreement with Liang, Chen, and Song.

At trial, Liu's counsel elicited testimony that the members of Shufood never executed an operating agreement for Shufood, and in closing, Liu's counsel argued that there was "no LLC." To the extent Liu's counsel was suggesting that Shufood did not exist as a separate entity because it did not have an operating agreement in place, and thus Liang, Chen, and Song were individually bound by the Withdrawal Agreement, Liu is incorrect. Although Liu, Liang, Chen, and Song never executed an operating agreement for Shufood, Shufood's Certificate of Formation was filed with the Texas Secretary of State on October 8, 2018. Shufood thus existed as a

19

separate legal entity as of that date. *See* TEX. BUS. ORGS. CODE § 3.001(c) ("The existence of a filing entity commences when the filing of the certificate of formation takes effect as provided by Chapter 4."); *id.* § 4.051 ("A filing instrument submitted to the secretary of state takes effect on filing, except as permitted by Section 4.052 or as provided by the provisions of this code that apply to the entity making the filing or other law."); *Steer Wealth Mgmt., LLC*, 537 S.W.3d at 567 (stating limited liability companies are legal entities separate from their members).

Because Liang, Chen, and Song are not parties to the Withdrawal Agreement, there is no privity of contract between them and Liu. We thus conclude the trial court erred by rendering judgment against Liang, Chen, and Song individually on Liu's breach of contract claim. *See Sanders*, 248 S.W.3d at 912 ("Privity is an essential element for recovery in any action based on contract. . .").

We sustain Liang, Chen, and Song's first issue.

### Liu's Breach of Contract Claim[4, 5]

In its second issue, Shufood argues the trial court erred by rendering judgment against it on Liu's breach of contract claim because Liu materially breached the

---

[4] Although Liu asserted a claim against Appellants for fraudulent inducement, Liu apparently abandoned the claim at trial. Even if she had not abandoned the claim, the trial court's amended final judgment disposed of all claims and Liu did not appeal the disposition of her fraudulent inducement claim.

[5] Because as we have explained, Liang, Chen, and Song are not parties to the Withdrawal Agreement, and trial court thus erred by rendering judgment against

20

Withdrawal Agreement first by engaging in acts "harmful" to Shufood, and Liu's prior material breach released Shufood from its payment obligations under the Withdrawal Agreement.

Shufood argues that Liu engaged in conduct "harmful" to Shufood by opening a competing restaurant within a week of signing the Withdrawal Agreement, offering dishes similar to Shufood's dishes in her new business using Shufood's misappropriated trade secrets, telling members of her WeChat groups that she was planning to make one of Shufood's menu items, taking away the WeChat groups Liu had contributed to Shufood, and using the groups to promote her new business. According to Shufood, Liu converted the WeChat groups to her own use when she announced and promoted her new business in those chat groups, thus diverting potential Shufood customers to her new restaurant. Shufood argues that Liang's damages report shows that "Shufood lost at least $9,100 to $10,000 during the year, and lost at least 120 customers" as a result of Liu's conduct, thus establishing that the conduct was "harmful."

Shufood also argues that the trial court erred in finding that the prohibition in Article III of the Withdrawal Agreement against engaging in any conduct "harmful" to Shufood, which the trial court characterized as a "non-compete agreement"

Liang, Chen, and Song individually on Liu's breach of contract claim, we limit this second issue concerning breach of the Withdrawal Agreement to Shufood.

21

clause, was not enforceable against Liu "due to the lack of signature by all parties."

It argues that Liu and Shufood, the only parties to the Withdrawal Agreement, signed

the agreement, and thus the agreement was enforceable.[6]

We agree with Shufood that the lack of signatures from Chen, Song, and Liang

do not render Article III of the Withdrawal Agreement unenforceable. As we have

noted, Chen, Song, and Liang were not parties to the Agreement, and thus their

signatures were not required. *See generally Baylor Univ. v. Sonnichsen*, 221 S.W.3d

632, 635 (Tex. 2007) ("Evidence of mutual assent in written contracts generally

consists of signatures of the parties and delivery with the intent to bind."). We must

still consider, however, whether Shufood established that Liu materially breached

Article III of the Withdrawal Agreement by engaging in conduct "harmful" to

Shufood.

Article III (1) of the Withdrawal Agreement states:

After signing the agreement, [Liu] shall not do any conducts that are harmful to [Shufood] and shall protect all the interests of the company. [Liu] shall not use any production method and technique as authorized by Bangbang Chicken Legend, shall not make any products that are the same as authorized by Bangbang Chicken Legend, and shall abide by the relevant confidentiality agreements between the two parties regarding the operation of the company.

---

[6]     Shufood also argues that if this portion of the Withdrawal Agreement is unenforceable against Liu, then the entire agreement is unenforceable against both parties because there was no meeting of the minds with regard to the nature and scope of the prohibited conduct. Because we conclude that the Withdrawal Agreement is enforceable, we need not address this argument.

Although the term "harmful," standing alone, is vague and ambiguous, we cannot consider terms in isolation when interpreting a contract. *See Northland Indus., Inc.*, 620 S.W.3d at 415. Rather, we must consider the language used in the context of the entire agreement. *See id.* When we consider the Withdrawal Agreement and the language of Article III as a whole, it is apparent that the prohibition in Article III against engaging in conduct "harmful" to Shufood is limited in scope by the language that immediately follows the stated prohibition, which expressly prohibits Liu from using any "production method and technique as authorized by Bangbang Chicken Legend" making "any products that are the same as authorized by Bangbang Chicken Legend," and requires her to "abide by the relevant confidentiality agreements between the two parties regarding the operation of the company [Shufood]." "Harmful," in the context of this Agreement, thus means using any of Bangbang Chicken Legend's authorized production methods and techniques, making a product that is the "same" as one authorized by Bangbang Chicken Legend, and violating any confidentiality agreement between Liu and Shufood, who are the only parties to the Withdrawal Agreement. *See BlueStone Nat. Res. II, LLC*, 620 S.W.3d at 387 ("Interpretation of a contract involves questions of law we consider de novo."). Outside of these express prohibitions, there is nothing in the Agreement that expressly prohibits Liang from competing with Shufood or opening her own restaurant.

23

Although Shufood argues that Liu violated the Withdrawal Agreement by engaging in harmful conduct including taking away her WeChat groups and promoting her new business in those groups by posting her menu, none of these alleged actions meet the definition of "harmful," as set forth in the Withdrawal Agreement. The only conduct which Shufood argues in its brief violated the "harmful" clause of the Withdrawal Agreement, and actually meets the scope of "harmful" conduct, is Liu's alleged use of BangBang Chicken Legends' authorized production methods and techniques to prepare dishes that were the "same" as one or more of BangBang Chicken Legends' authorized dishes. But the record is devoid of any evidence that Liu engaged in such conduct.

Liang, who never tasted any of Liu's menu items and did not know what ingredients were in her dishes, testified that she knew Liu had copied some of Shufood's dishes based on photographs she had seen of Liu's dishes, the names and descriptions of Liu's dishes, and customer feedback. According to Liang, Liu's dishes "look[ed] very, very close to ours," and the names and contents of Liu's dishes were "very similar [to the] dishes that we have in our restaurant." At most, this establishes that the dishes on Liu's menu looked similar to those on Shufood's menu, but there is no evidence the dishes were in fact the same or that Liu prepared them by using Shufood's alleged proprietary or trade secret information. Chen also testified that several of the dishes listed on Liu's menu were "similar" to dishes

Shufood offered. When asked how she knew Liu was preparing the same or similar dishes or using the same processes or cooking methods as Shufood, Chen testified that one of Liu's dishes, the Sichuan peppercorn chicken, "is off the recipe of Bang Bang Chicken" and Chen was not aware of any other restaurant offering the dish. He testified that Liu promised a WeChat group member that she would offer "spicy chicken paws," which is a dish that Chen taught Liu how to prepare, and the preparation of the dish requires knowledge of Bang Bang Chicken Legend's confidential information, including the ingredients, and method and techniques. "Spicy chicken paws," however, is not one of the dishes listed on either of the menus Liu posted in the WeChat group nor is there any evidence that Liu actually prepared or sold "spicy chicken paws" or that she prepared any dish using Shufood's purported trade secret or confidential information. While there is some evidence Liu intended to offer a dish similar to Shufood's "spicy chicken paws." there is no evidence Liu ever did. At most, Liang and Chen speculate that Liu prepared and sold the same dish.

Liu was not questioned at trial about the recipes, preparation methods, and techniques she used to prepare the dishes listed in the menus she posted to the WeChat groups, and there is no testimony about the production methods or techniques Liu used to prepare her dishes, much less that the production method and techniques Liu used were "authorized by Bangbang Chicken Legend." At most,

25

Liang and Chen speculate based on the photographs and the names of the dishes in the menus Liu posted to the WeChat groups, including Liu's exchange with one of her members about the "spicy chicken paws" dish, that Liu used Bangbang Chicken Legend's recipes, production methods, and techniques to prepare the dishes on her menu. *See King Ranch, Inc.*, 118 S.W.3d at 751 (stating there is less than scintilla of evidence when evidence is "so weak as to do no more than create a mere surmise or suspicion" of material fact); *Ford Motor Co.*, 135 S.W.3d at 601 (stating to prevail on sufficiency challenge, party with burden of proof must demonstrate on appeal that evidence establishes, as matter of law, all vital facts in support of issue).

To the extent Shufood contends Article III also contains a non-compete clause prohibiting Liu from opening a new restaurant, Shufood did not establish Liu opened a competing restaurant in violation of the clause. Liu's counsel stated in his closing argument that Liu "never opened a restaurant," and he argued "there was no testimony or evidence that [Liu] opened a restaurant." The only evidence on this point was offered by Song, who testified that the Tea Bar, where Liu announced she would open her restaurant, was located near her home. Song passed by the "store," but she did not go in. She did not see a restaurant sign or pay any attention to signs. Song testified that she believed it was Liu's restaurant only because a friend told her it was Liu's restaurant, "A friend pointed and said that is Ms. Liu's restaurant." There was no testimony that explained how the friend knew it was Liu's restaurant

26

and no evidence that the friend actually visited the restaurant. Song testified that the friend who told her about the restaurant was her roommate, but when pressed for more information, Song claimed she could not recall the name of the friend because she had only been her roommate for a short period of time and the friend was "gone already." Thus, at best, Chen speculated based on her friend's statement that Liu had opened a restaurant. We cannot conclude, based on this evidence, that Shufood established, as a matter of law, all vital facts in support of its allegations of material breach. *See King Ranch, Inc.*, 118 S.W.3d at 751 (stating there is less than scintilla of evidence when evidence is "so weak as to do no more than create a mere surmise or suspicion" of material fact); *Ford Motor Co.*, 135 S.W.3d at 601 (stating to prevail on sufficiency challenge, party with burden of proof must demonstrate on appeal that evidence establishes, as matter of law, all vital facts in support of issue). Moreover, to the extent resolution of this issue rested on the credibility of witnesses, we defer to the trial court, as the fact finder, to resolve conflicts in the evidence. *See Miranda v. Byles*, 390 S.W.3d 543, 553 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (stating as factfinder in bench trial, trial court determines credibility of witnesses and weight to be given their testimony and resolve inconsistencies in testimony).

We thus conclude there is no evidence Liu breached the Withdrawal Agreement. We overrule Shufood's second issue.

27

**Appellants' Counterclaims**

In their third issue, Appellants argue the trial court erred in rendering a take nothing judgment against them on their counterclaims against Liu for breach of contract, anticipatory repudiation of contract, breach of fiduciary duty, fraudulent inducement, fraud by non-disclosure, and violations of TUTSA because there is sufficient evidence supporting each counterclaim.[7] Appellants further argue the trial court erred in holding that it was "not necessary to review each of Defendant's counterclaims since the pertinent language in the agreement [was] deemed unenforceable" because Appellants' counterclaims for breach of fiduciary duty and TUTSA violations are not dependent upon the enforceability of the Withdrawal Agreement.

> In its amended final judgment, the trial court stated:
>
> Defendants' counterclaims of Plaintiffs' acts of breach relied upon the assertion that Plaintiff opened a restaurant nearby producing dishes copied from Defendant's recipe and methods prohibited by the agreement. This assertion was not supported with sufficient evidence to hold Plaintiff liable for any of the counterclaims.
>
> Terms of the non-compete agreement were deemed unenforceable due to the lack of signature by all parties. Plaintiff, therefore did not commit a breach of the agreement and as such, Defendants were not excused from performance to Plaintiff regarding payment as agreed to. It is not necessary to review each of Defendant's counterclaims since the

---

[7] Although Appellants argue that their counterclaims are supported by sufficient evidence, they do not articulate the proper standard for reviewing such claims on appeal. Nevertheless, we liberally construe Appellants' argument as a challenge to the legal sufficiency of the evidence supporting the trial court's take nothing judgment on each of their counterclaims.

28

pertinent language in the agreement is deemed unenforceable against Plaintiff.

## A.     Breach of Contract Counterclaim

Shufood's breach of contract counterclaim against Liu is premised on the same set of facts upon which its prior material breach defense rested: Liu's opening of a competing restaurant within a week of signing the Withdrawal Agreement, offering dishes similar to Shufood's dishes in her new business by using Shufood's misappropriated trade secrets, and converting the WeChat groups Liu had contributed to Shufood to her own use when she announced and promoted her new business in those chat groups, thus diverting potential Shufood customers to her new restaurant. As previously discussed, there is no evidence that Liu's conduct violated any portion of the Withdrawal Agreement and thus Shufood failed to demonstrate that the evidence established every element of its breach of contract claim as a matter of law. *See Ford Motor Co.*, 135 S.W.3d at 601 (stating to prevail on sufficiency challenge, party with burden of proof must demonstrate on appeal that evidence establishes, as matter of law, all vital facts in support of issue).

We overrule Shufood's challenge to the trial court's rendering of a take nothing judgment on its breach of contract counterclaim.

**B.     Anticipatory Breach of Contract[8]**

Repudiation or anticipatory breach is a positive and unconditional refusal to perform the contract in the future, expressed either before performance is due or after partial performance. *CMA-CGM (Am.), Inc. v. Empire Truck Lines, Inc.*, 416 S.W.3d 495, 519 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). "It is conduct that shows a fixed intention to abandon, renounce, and refuse to perform the contract." *Id.*; *Chapman v. Olbrich*, 217 S.W.3d 482, 491 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ("A party repudiates a contract if the party manifests, by words or actions, a definite and unconditional intention not to perform the contract according to its terms."). To constitute a repudiation, the party must have "absolutely repudiated the contract without just cause." *N.Y. Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 216 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). When a party asserts repudiation as an affirmative defense, that party bears the burden to prove that the opposing party unconditionally refused to perform the contract. *Id.* ("Repudiation or anticipatory breach is an unconditional refusal to perform the contract in the future, which can be expressed either before performance is due or after partial performance.").[9]

---

[8]     Because Liang, Chen, and Song are not parties to the Withdrawal Agreement, we limit our discussion of this issue to Shufood.

[9]     Although Appellants did not plead any affirmative defenses, to the extent Shufood raised anticipatory breach as a defense, such a defense was tried by consent.

Shufood argues that when Liu signed the Withdrawal Agreement, Liu had no intention of performing her contractual obligation to abstain from engaging in any "harmful" conduct towards Shufood because Liu was already planning to open her own competing Chinese restaurant. Shufood argues that it took "several months to prepare to open a restaurant" and the "fact that Liu opened her own restaurant within one week after she signed the Withdrawal Agreement" indicates Liu was planning to "open her own restaurant in the neighboring block next to Shufood" while she was a member of Shufood.

The record reflects that it took Shufood's members several months before Shufood was ready to open for business because, among other things, they needed to remodel the restaurant, coordinate with Bang Bang Chicken Legend's headquarters in China to obtain the proper branding and materials, and receive training on the preparation of Bang Bang Chicken Legend's menu items. There is no evidence that Liu's purported business, Sister Rong of Guizhou, required such extensive preparation or that Liu actually opened such a business. Rather, the record indicates that after signing the Withdrawal Agreement, Liu posted a menu for Sister Rong of Guizhou and announced that the business would be selling dishes at Tea Bar, an established business located one block from Shufood's restaurant. Liu was not questioned about her relationship to Tea Bar or the business arrangement between Tea Bar and Sister Rong of Guizhou, or any other facts regarding the events

31

leading up to the alleged opening of her new business. At most, Appellants speculate that Liu must have been planning to open her own business when she signed the Withdrawal Agreement and thus had no intention of complying with the contract's prohibition against engaging in conduct "harmful" to Shufood, because she opened her business within a week of signing the agreement and it took Shufood several months before its store was ready to open. Such speculation, however, amounts to no more than a scintilla of evidence and certainly does not conclusively establish this fact as a matter of law. *See King Ranch, Inc.*, 118 S.W.3d at 751 (stating there is less than scintilla of evidence when evidence is "so weak as to do no more than create a mere surmise or suspicion" of material fact); *Ford Motor Co.*, 135 S.W.3d at 601 (stating to prevail on sufficiency challenge, party with burden of proof must demonstrate on appeal that evidence establishes, as matter of law, all vital facts in support of issue).

We overrule Shufood's challenge to the trial court's rendering of a take nothing judgment on Shufood's anticipatory breach of contract counterclaim.

## C. Fraudulent Inducement

Shufood argues that Liu fraudulently induced Shufood to enter into the Withdrawal Agreement by representing to Liang that she wanted to withdraw as a member of Shufood because she wanted to spend more time with her child, she could not work long hours, and she needed Shufood to return her $15,717 investment to

32

support her child. According to Shufood, Liu knew these representations were false because Liu was planning to open a restaurant after withdrawing from Shufood and the restaurant would be open from 11:00 a.m. to 7:30 p.m., Monday through Sunday.

To establish a claim for fraudulent inducement, a party must establish there was (1) a material representation, (2) that was false and was either known to be false when made or was asserted without knowledge of its truth, (3) made with the intent it be acted upon, (4) the representation was relied upon, and (5) the reliance caused injury. *Zorrilla v Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015). "Fraudulent inducement . . . is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001); *see also Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 423 (Tex. 2015) (per curiam). Although fraudulent inducement shares the same elements as common-law fraud, it "involves a promise of future performance made with no intention of performing at the time it was made." *Zorrilla*, 469 S.W.3d at 153.

Shufood argues that Liu's representation to Liang that she wanted to withdraw from Shufood and recoup her investment because she needed to spend more time with her child and that she needed the money to support her family was false and Liu knew it was false because Liu was already planning to open a restaurant after she withdrew from Shufood and the restaurant would be open from 11:00 a.m. to

33

7:30 p.m., Monday through Sunday. As we have discussed, there is no evidence that Liu was planning to open her own business selling dishes similar to Shufood's dishes prior to withdrawing from Shufood. Although the record reflects that Tea Bar, the location from which Liu allegedly operated Sister Rong of Guizhou, is open from 11:00 a.m. to 7:30 p.m., Monday through Sunday, there is no evidence that Liu worked those same hours or that she in fact opened a competing business there selling Shufood's dishes. Nor is there any evidence regarding the amount of Liu's capital investment in Sister Rong of Guizhou. There is thus no evidence conclusively establishing as a matter of law that Liu's representations to Liang regarding her reasons for leaving Shufood were false. *See King Ranch, Inc.*, 118 S.W.3d at 751 (stating there is less than scintilla of evidence when evidence is "so weak as to do no more than create a mere surmise or suspicion" of material fact); *Ford Motor Co.*, 135 S.W.3d at 601 (stating to prevail on sufficiency challenge, party with burden of proof must demonstrate on appeal that evidence establishes, as matter of law, all vital facts in support of issue).

We overrule Shufood's challenge to the trial court's rendering of a take nothing judgment on its fraudulent inducement counterclaim.

## D. Breach of Fiduciary Duty

Appellants argue that as a member and manager of Shufood, Liu owed Shufoood and its other members a "strict duty of good faith and candor and was

prohibited from using the relationship to benefit [her] personal interests without [Shufood's and the other members'] full knowledge and consent." Appellants argue that Liu breached that duty by (1) "prepar[ing] to open her own restaurant and convert[ing] Shufood's potential customers when she was still a member and manager of Shufood," (2) failing to disclose to Shufood her plan to open a restaurant and convert Shufood's potential customers, and (3) misleading Shufood regarding her reasons for wanting to withdraw from the company by telling Liang that Liu "could not work for long hours and had to stay at home with her child."

To prevail on a claim for breach of fiduciary duty, the plaintiff must establish (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). Lost profits are recoverable for a breach of fiduciary duty when it is shown that the loss is the natural and probable consequence of the complained of act. *Texas Instruments, Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276, 279 (Tex. 1994); *Miller v. Argumaniz*, 479 S.W.3d 306, 311 (Tex. App.—El Paso 2015, pet. denied). Although the recovery for lost profits does not require that the loss be susceptible of exact calculation, the injured party must nevertheless demonstrate the amount of the loss with reasonable certainty, by competent evidence. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). Lost profits are damages for the loss of net income to a business and, broadly

35

speaking, reflect income from lost business activity, less expenses that would have been attributable to that activity. *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002) ("Lost profits are damages for the loss of net income to a business measured by reasonable certainty."). The calculation of lost-profits damages must be based on net profits, not gross revenue or gross profits. *See Heine*, 835 S.W.2d at 83 n. 1; *Kellmann v. Workstation Integrations, Inc.*, 332 S.W.3d 679, 684 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

The Texas Business Organizations Code does not directly address the duties members and managers of a limited liability company owe to the company or another member. *See Sohani v. Sunesara*, No. 01-20-00114-CV, 2023 WL 1112165, at *14 (Tex. App.—Houston [1st Dist.] Jan. 31, 2023, pet. denied) (mem. op.); *Houle v. Casillas*, 594 S.W.3d 524, 546 (Tex. App.—El Paso 2019, no pet.). Section 101.401 merely states, "The company agreement of a limited liability company may expand or restrict any duties, including fiduciary duties, and related liabilities that a member, manager, officer, or other person has to the company or to a member or manager of the company." TEX. BUS. ORGS. CODE § 101.401. Texas courts have concluded that this section presumes the existence of fiduciary duties owed by members and managers, noting that the section provides that "a limited liability company may 'expand or restrict' any duties (including fiduciary duties) of a member, manager, officer, or other person." *Cardwell v. Gurley*, No. 05-09-01068-CV, 2018 WL

36

3454800, at *5 (Tex. App.—Dallas July 18, 2018, pet. denied) (mem. op.); *see also*

*Straehla v. AL Global Servs., LLC*, 619 S.W.3d 795, 805 (Tex. App.—San Antonio

2020, pet. denied) (presuming "based on the assumption inherent in section 101.401"

that member owed same fiduciary duties to company that corporate executive or

partner owes to corporation or partnership, unless company agreement demonstrates

otherwise).

One of the duties a fiduciary owes its principal is the duty of loyalty. "The

duty of loyalty dictates that a corporate officer or director must act in good faith and

must not allow his or her personal interest to prevail over the interest of the

corporation. The duty of loyalty is described as requiring an extreme measure of

candor, unselfishness, and good faith on the part of the officer or director." *Loy v.

Harter*, 128 S.W.3d 397, 407 (Tex. App.—Texarkana 2004, pet. denied). A

fiduciary, however, does not violate the duty of loyalty by merely planning to

compete against its principal in the future. *Compare Ameristar Jet Charter, Inc. v.

Cobbs*, 184 S.W.3d 369, 373–74 (Tex. App.—Dallas 2006, no pet.) (holding

employee did not breach of fiduciary duty when employee formed competing

business while employed but did not compete with employer until after he resigned)

and *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510–11 (Tex. App.—Houston

[1st Dist.] 2003, no pet.) (stating employee who secretly joined with other employees

to make plans for forming competing business and took "permissible preparations

to compete" while still employed, such as incorporating business entity and obtaining permits and insurance, did not violate fiduciary duty to employer) *with Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 285 (5th Cir. 2007) (holding fiduciary employee had duty to disclose plans to compete with employer when employee negotiated lease on behalf of employer, employer would be burdened with substantial lease payments when employee left, and employee planned to use lease as leverage against employer).

Although a fiduciary may make plans to compete with its employer and make some preparations to compete without breaching its fiduciary duty, a fiduciary may not (1) appropriate the company's trade secrets, (2) solicit his employer's customers while still working for his employer, (3) solicit the departure of other employees while still working for his employer, or (4) carry away confidential information, such as customer lists. *Abetter Trucking Co.*, 113 S.W.3d at 512 (citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 202 (Tex. 2002)). To the extent Appellants argue Liu breached her fiduciary duty by misappropriating Shufood's trade secrets before she withdrew from Shufood, as we discuss below, there is insufficient evidence supporting Appellants' claim for misappropriation of trade secrets. *See id*. There is also no evidence that while still a member of Shufood, Liu solicited Shufood's customers or employees or took any other impermissible preparatory steps to compete with Shufood. *See id*. Even assuming Liu formulated

38

a plan, while still a member and manager of Shufood, to open her own restaurant after her departure from Shufood, Liu did not have a duty to disclose her plans to Appellants. *See id.* at 510 (stating fiduciary relationship "does not preclude the fiduciary from making preparations for a future competing business venture" and fiduciary employee "has no general duty to disclose his plans and may secretly join with other employees in the endeavor without violating any duty to the employer").

Appellants also argue that Liu breached her fiduciary duty by misleading them about her reasons for wanting to withdraw from the LLC when she told Liang that she "could not work for long hours and had to stay at home with her child." As previously discussed, there is no evidence that Liu's statements to Liang were false or misleading. And to the extent Appellants challenge the veracity of Liu's statements, as the fact finder in a bench trial, it was the role of the trial court to determine the credibility of witnesses and weight to be given their testimony and to resolve any inconsistencies in testimony, and we defer to the trial court's resolution of these issues. *See Miranda*, 390 S.W.3d at 553 (stating as factfinder in bench trial, trial court determines credibility of witnesses and weight to be given their testimony and resolves inconsistencies in testimony).

Even if Appellants were able to establish that Liu breached her fiduciary duty, there is insufficient evidence of damages. Liang, Shufood's damages expert, prepared a report which she contends demonstrates that Shufood lost over $9,000 in

sales due to Liu's alleged harmful conduct. Lost profits "can be recovered only when both the fact and amount of damages is proved with reasonable certainty." *Horizon Health Corp. v. Acacia Healthcare Co., Inc.*, 520 S.W.3d 848, 860 (Tex. 2017). "A party's bare assertion that a contract was lost does not establish lost profits with reasonable certainty." *Id.* The general rule is that recovery of lost profits is allowed "where it is shown that a loss of profits is the natural and probable consequence of the act or omission complained of, and their amount is shown with sufficient certainty." *Id.* (quoting *Tex. Instruments*, 877 S.W.2d at 279).

Texas courts require "that a plaintiff seeking damages based on lost profits from future business opportunities adduce evidence establishing that prospective customers would have done business with the plaintiff absent the defendant's misconduct." *Id.* at 681. Shufood did not present evidence that its customers were diverted to Liu's new restaurant or that it would have secured continued business from existing or prospective customers absent Liu's alleged harmful conduct. Moreover, even assuming Liang's report provides some evidence of the amount of total sales or gross income Shufood lost as a result of Liu's alleged conduct, the report does not provide any evidence of the amount of lost net income. "Lost profits are damages for the loss of net income to a business measured by reasonable certainty." *Miga*, 96 S.W.3d at 213; *see also Kellmann*, 332 S.W.3d at 684 (stating calculation of lost-profits damages must be based on net profits, not gross revenue

40

or gross profits). Because "the calculation of lost profits must be based on net profits, not gross revenue or gross profit," Liang's report is insufficient to establish lost profits with reasonable certainty. *See Kellman*, 332 S.W.3d at 684 ("Lost profits are damages for the loss of net income to a business and, broadly speaking, reflect income from lost-business activity, less expenses that would have been attributable to that activity.").

We overrule Appellants' challenge to the trial court's rendering of a take nothing judgment on their breach of fiduciary duty counterclaim.

## E. Fraud by Non-Disclosure

Appellants argue that Liu defrauded them by not disclosing that she planned to open her own restaurant before signing the Withdrawal Agreement. To establish fraud by non-disclosure, the plaintiff must show that (1) the defendant deliberately failed to disclose material facts, (2) the defendant had a duty to disclose such facts to the plaintiff, (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them, (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure, and (5) the plaintiff relied on the non-disclosure, which resulted in injury. *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219–20 (Tex. 2019); *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001) (stating "silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he

41

deliberately remains silent"). Although a party generally does not have a duty of disclosure absent evidence of a confidential or fiduciary relationship, the duty to disclose may also arise if the party (1) discovered new information that made its earlier representation untrue or misleading, (2) made a partial disclosure that created a false impression, or (3) voluntarily disclosed some information, creating a duty to disclose the whole truth. *Bombardier Aerospace Corp.*, 572 S.W.3d at 220. Whether a party owes a duty to disclose is a question of law. *See Bradford*, 48 S.W.3d at 755.

Appellants argue that as their fiduciary, Liu had a duty to disclose to them, before they signed the Withdrawal Agreement, that she was planning to open her own restaurant after withdrawing from Shufood. Appellants further argue that in addition to her fiduciary obligations, Liu had a duty to disclose to them that she was planning to open her own restaurant after withdrawing from Shufood because by representing to Liang that she wanted to withdraw from the LLC to spend more time with her child and that she needed her initial investment back to support her child, Liu made a partial disclosure that created a substantially false impression regarding her reasons for withdrawing from Shufood.

Appellants cite no case for the proposition that a fiduciary has an obligation to disclose her plans to compete with her principal in the future. As we have noted, a fiduciary is not precluded "from making preparations for a future competing

business venture; nor do such preparations necessarily constitute a breach of fiduciary duties." *See Abetter Trucking Co.*, 113 S.W.3d at 510. Moreover, as previously discussed, there is no evidence Liu was planning to open her own restaurant when she first spoke to Liang about her reasons for withdrawing from Shufood, that Liu's statements regarding the need to care for her child or work less hours were false, or that Liu developed a plan to compete after she spoke to Liang, but before she signed the Withdrawal Agreement.

We thus conclude that Appellants failed to demonstrate that the evidence establishes, as a matter of law, all vital facts in support of their counterclaim for fraud by non-disclosure. *See Dow Chem. Corp.*, 46 S.W.3d at 341 (stating when party attacks legal sufficiency of evidence supporting adverse finding on issue for which it bore burden of proof, it must demonstrate on appeal that evidence establishes, as a matter of law, all vital facts in support of issue).

We overrule Appellants' challenge to the trial court's take nothing judgment against them on their counterclaim for fraud by non-disclosure.

## F. Texas Uniform Trade Secrets Act

Shufood argues the trial court erred in holding that "[i]t is not necessary to review each of Defendant's counterclaims since the pertinent language in the agreement is deemed unenforceable against Plaintiff" because [its] counterclaim based on the TUTSA is not dependent upon the enforceability of the Withdrawal

43

Agreement. Although we agree that Shufood's TUTSA claim is independent of the Withdrawal Agreement, the trial court also determined that Appellants' counterclaims, including the TUTSA claim, were not supported by sufficient evidence.

The elements of misappropriation of trade secrets under TUTSA are (1) ownership of a trade secret, (2) misappropriation of the trade secret, and (3) an injury, if the plaintiff is seeking damages. TEX. CIV. PRAC. & REM. CODE §§ 134A.002(1), (3), (6), 134A.004(a); *see also EJ Madison, LLC v. Pro-Tech Diesel, Inc.*, 594 S.W.3d 632, 643 (Tex. App.—El Paso 2019, no pet.). TUTSA provides that a "trade secret" means:

> . . . all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:
>
> (A)  the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and
>
> (B)  the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

TEX. CIV. PRAC. & REM. CODE § 134A.002(6). This standard requires that the owner of the trade secret take reasonable measures to keep the information secret but does not require proof that the alleged trade secrets have been held in absolute secrecy to establish the existence of a trade secret or that information is worthy of trade secret protection pending final resolution on the merits. *See HouseCanary, Inc. v. Title Source, Inc.*, 622 S.W.3d 254, 266 (Tex. 2021). Whether the owner has taken reasonable measures to keep the information secret is generally a fact-intensive determination. *See id.* A claim for trade-secret misappropriation accrues "when the trade secret is actually used." *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 721–22 (Tex. 2016) (quoting *Comp. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)).

According to Shufood, Liu misappropriated Shufood's trade secrets by, among other things, "converting Shufood's social network groups, diverting Shufood's customers to her own restaurant, and having intended to cook the Shufood menu items in her own restaurant within proximity of Shufood." Shufood argues that the "confidential recipes, ingredients, preparation processes for the menu items and Shufood's customers in its social network groups" are trade secrets "because they fall within the subject matter of trade secrets, they are the subject of reasonable

45

efforts to protect their secrecy, and they are economically valuable to competitors and not readily obtainable by proper means." [10]

Shufood does not direct the court to any evidence it took "reasonable measures under the circumstances to keep" its alleged proprietary information secret. TEX. CIV. PRAC. & REM. CODE § 134A.002(6)(A). The record reflects that, aside from Shufood's social network groups, Shufood's purported trade secrets are contained in the two books Chen and Song brought with them from China. Liang testified that the books were kept in a "public area" in the restaurant where all employees had access to them. None of Shufood's members or employees were required to sign a confidentiality agreement because, according to Liang, everyone "had to read the two books" and the first page of the book stated that "all the readers have to keep secret regarding the materials and contents of this book." No portion of the books, including the first page with the alleged confidentially clause, was admitted into evidence. Aside from the language on the first page, there is no evidence that the information contained within the books was labeled or identified as confidential. We thus conclude there was no evidence Shufood took "reasonable measures under the

---

[10]     Aside from citing to TUTSA and caselaw for the elements of a claim for misappropriation of trade secrets, Shufood does not offer any additional legal authority in support of its argument that Liu violated TUTSA and it includes only one citation to the record. Shufood thus arguably waived this argument due to inadequate briefing. *See* TEX. R. APP. P. 38.1. Even assuming Shufood did not waive this issue, it still cannot not prevail on appeal for the reasons discussed in the body of the opinion.

circumstances to keep" its alleged proprietary information secret. *See Baxter & Assocs., L.L.C. v. D & D Elevators, Inc.*, No. 05-16-00330-CV, 2017 WL 604043, at *10 (Tex. App.—Dallas Feb. 15, 2017, no pet.) (mem. op.) (holding evidence was legally insufficient to show information was "the subject of any efforts to maintain its secrecy" where employer failed to have employees sign non-compete agreements, did not label information as "confidential" or "proprietary," and did not protect information through passwords or encryption).

Shufood also argues that Liu misappropriated its customer list or "social network groups" when she withdrew her WeChat group from the shared group that had been combined with Liang's WeChat group. These groups, however, are public and the identity of the members of Liu's WeChat group are not a secret to any of the members of the group, including Chen, one of Shufood's members. Furthermore, Liu was not questioned at trial about the recipes, preparation methods, and techniques she used to prepare the dishes she advertised in the menus she posted to her WeChat groups. The only menu item Appellants identify on appeal as one of Shufood's special and proprietary menu items, is "spicy chicken paws." While there is evidence that Liu told one of the members in the WeChat group that she would be offering that dish in the future, there is no evidence Liu actually prepared or offered the dish or that the dish was the same as Shufood's "spicy chicken paws." At most, Shufood speculates, based on the photographs and the names of the dishes in the

47

menus Liu posted to the WeChat groups, including Liu's exchange with one of the members about the "spicy chicken paws" dish, that Liu used Bangbang Chicken Legend's recipes, production methods, and techniques to prepare those dishes. Even assuming Shufood proved that any of Bangbang Chicken Legend's recipes, production methods, or techniques qualify as a trade secret, Shufood's speculative testimony amounts to less than a scintilla of evidence that Liu used any of Bangbang Chicken Legend's trade secrets. *See King Ranch, Inc.*, 118 S.W.3d at 751 (stating there is less than scintilla of evidence when evidence is "so weak as to do no more than create a mere surmise or suspicion" of material fact); *Sw. Energy Prod. Co.*, 491 S.W.3d at 721–22 (stating cause of action for trade-secret misappropriation accrues "when the trade secret is actually used"); *see generally Los Cucos Mexican Cafe, Inc. v. Sanchez*, No. 13-05-578-CV, 2007 WL 1288820, at *2 (Tex. App.—Corpus Christi–Edinburg May 3, 2007, no pet.) (mem. op.) (holding appellant who "merely contends on appeal that Texas courts have held that recipes are a type of property that can be afforded a trade secret protection," failed to "bring forth any competent evidence that its recipes for Mexican food are trade secrets, that appellees used their recipes, or that it suffered economic damage as a result of the alleged misappropriation").

We conclude Shufood failed to demonstrate that the evidence establishes, as a matter of law, all vital facts in support of its TUTSA counterclaim. *See Dow Chem.*

*Corp.*, 46 S.W.3d at 341 (stating when party attacks legal sufficiency of evidence supporting adverse finding on issue for which it bore burden of proof, it must demonstrate on appeal that evidence establishes, as a matter of law, all vital facts in support of issue).

We overrule Shufood's challenge to the trial court's rendering of a take nothing judgment on its TUTSA counterclaim.

## Conclusion

We reverse the portion of the trial court's judgment rendering judgment against Liang, Chen, and Song for Liu's breach of contract claim, and we affirm the judgment in all other respects.

Veronica Rivas-Molloy
Justice

Panel consists of Chief Justice Adams and Justices Hightower and Rivas-Molloy.